In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1243

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

*v.*

GARY S. WILLIKY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:15-cv-00357-WTL-MJD — **William T. Lawrence**, *Judge.*

SUBMITTED SEPTEMBER 16, 2019* —
DECIDED NOVEMBER 8, 2019

---

* We have agreed to decide this case without oral argument because the
briefs and record adequately present the facts and legal arguments, and oral
argument would not significantly aid the court. Fed. R. App. P. 34(a)(2)(C).

Before BAUER, BRENNAN, and ST. EVE, *Circuit Judges*.

BAUER, *Circuit Judge.* Gary Williky appeals a judgment in favor of the Securities and Exchange Commission ("SEC") that followed a bifurcated settlement agreement regarding Williky's fraudulent conduct while working for the Indiana-based company Imperial Petroleum, Inc. ("Imperial"). This court addressed the details of Imperial's fraudulent scheme in *United States v. Wilson*, 879 F.3d 795 (7th Cir. 2018). Imperial fraudulently purchased finished biodiesel and resold it while claiming government incentives and tax-credits available to companies producing biodiesel from raw feedstock. Jeffery Wilson, Imperial's ex-CEO, hired Williky to artificially inflate Imperial's stock through a series of "wash and match trades" and "scalping" emails. In the 1990s, Williky similarly engaged in a pattern of "wash and match trades" for another company led by Wilson. As part of Imperial, Williky acquired millions of shares of its stock but failed to lawfully report his ownership levels when his shares surpassed five percent. At issue in this appeal is Williky's conduct once the Imperial fraud unraveled. By July 2011, Williky knew Imperial misrepresented the source of its biodiesel to investors and, by November, knew the complete extent of Imperial's fraud. Williky sold off the entirety of his Imperial shares by February 27, 2012, and avoided a loss of $798,217.

The SEC sued to permanently enjoin Williky from violating federal securities law, to enjoin Williky from acting as an officer or director of a public company, and to disgorge his financial gains. The SEC further sought to impose financial penalties, including a civil penalty for Williky's insider trading. Before Williky faced his deposition, he entered into a bifur-

cated settlement with the SEC, conceding his involvement in the fraudulent scheme and agreeing that the district court would determine the financial remedies to be assessed. The SEC requested the statutory maximum civil penalty of $2,394,651 for insider trading, calculated as three times Williky's avoided losses. Williky objected, arguing that the SEC's proposed judgment ignored his cooperation with various governmental agencies investigating Imperial's fraud. The district court denied the request for the maximum civil penalty as excessive and entered a judgment of $1,596,434, equal to two times the avoided losses. On appeal, Williky argues that the judgment still ignores his cooperation as a whistleblower and is thus an abuse of discretion. We find that the district court adequately assessed the value of Williky's cooperation and affirm.

## I. BACKGROUND

In 2009, Gary Williky entered into confidential negotiations with Imperial's ex-CEO Jeffery Wilson and accepted a financial public relations role with Imperial. In reality, Wilson hired Williky to artificially inflate Imperial's stock through illegal market manipulation. This was not the first time Wilson and Williky engaged in securities fraud. Williky's long-standing relationship with Wilson dated back to the 1990s. Williky settled a lawsuit with the SEC for illegal "wash and match trades" that he committed for another company led by Wilson. *SEC v. Williky, et al.*, 94-cv-2088 (N.D. Tex.). Although Williky's involvement in the Imperial scheme is not directly at issue in this appeal, we recount some of his fraudulent activities as context for Williky's insider trading.

Williky first sought to artificially raise Imperial's stock price by increasing its trading volume through "wash and match trades." Wash trades refer to trades that occur without a change in beneficial ownership. Match trades, or "matched orders," are trades in which orders are entered with the knowledge that substantially equivalent orders will be made by the same or different person. These fraudulent tactics create a false perception of market activity that does not reflect the true supply and demand for the securities. Inflating the volume of trades attracts additional market participants and thereby artificially increases stock price. Williky used multiple brokerage accounts in his and his wife's names to conduct a series of at least twenty "wash and match trades" from March 4, 2010, to January 11, 2012. On many days within this time period, Williky was responsible for between 50% to 100% of Imperial's trading volume.

Second, Williky personally sent out "scalping" emails touting the potential value of Imperial's stock without disclosing his own relationship to Imperial or his intention to contemporaneously sell Imperial stock. Williky sent these emails out to more than 200 recipients. In the days following the emails, Williky sold Imperial stock and earned profits of over $60,000. During this time, Williky acquired millions of shares and at many points owned more than five percent of the company's stock without disclosing his ownership levels as required by federal securities law.

By July 10, 2011, Williky learned that Imperial was lying to investors about its biodiesel production. Specifically, a confidential memo informed Williky that Imperial was using partially processed oil or fat to make biodiesel. This informa-

tion directly contradicted representations Williky had previously made that the fuel came from raw feedstock. Moreover, a hedge fund informed Imperial that it would not invest since the production of biodiesel from such materials failed to qualify for the government incentives that Imperial claimed. By November 18, 2011, Williky learned the complete extent of Imperial's fraud after the new Imperial CEO, John Ryer, secretly recorded a conversation with the owner of Imperial's main suppler, Joe Furando. Ryer told Williky that Imperial was purchasing finished fuel from Furando's company and later provided Williky with the tape. While in possession of all this confidential information, Williky sold off the entirety of his shares by February 27, 2012, avoiding a loss of $798,217.

As he sold his shares, Williky contacted federal authorities with the hopes of becoming a whistleblower. However, though Williky believes he provided the critical information that toppled Imperial, the SEC presented evidence that it and other federal agencies believed the Imperial scheme was already unraveling. Williky anonymously called the Environmental Protection Agency on December 27, 2011, to discuss suspected wrongdoing without naming Imperial. Although Williky claims this led to the investigation of Imperial, the SEC began investigating Imperial as early as November 2011 and interviewed its first witness on January 23, 2012, weeks before Williky first reported Imperial's violations on March 13, 2012. Williky also contends that on this day he provided authorities with the confidential tape recording between Ryer and Furando, which he argues was the "smoking gun" that led to the indictment and conviction of several co-conspirators in the Imperial scheme. Furthermore, Williky says that as part of his

productions to the SEC, he provided 36 documents that were ultimately used in Wilson's trial.

On March 2, 2015, the SEC charged Williky with violating federal securities laws through market manipulation and insider trading. On August 10, 2015, the district court *sua sponte* administratively closed the case pending the resolution of the criminal actions related to the Imperial scheme. The case was reopened on January 19, 2017, but Williky did not file his answer to the complaint until February 21, 2017, only after the SEC had moved for a clerk's entry of default. Once discovery commenced, Williky objected to the deposition of himself and his wife because of scheduling issues that the district court found had "absolutely no basis." Finally, instead of facing his deposition, Williky entered into a bifurcated settlement with the SEC in which Williky would accept the SEC's proposed injunctions, and the district court would determine the financial remedies to be assessed against Williky based on the facts of the complaint.

The SEC thereafter filed its motion for financial remedies, requesting the disgorgement of $2,101,334 in ill-gotten gains plus $427,931 in prejudgment interest, along with a civil penalty for insider trading of at least $2,394,651. Williky objected to the request for a civil penalty at the statutory maximum of three times his avoided losses on the basis that it "completely ignore[d] his cooperation with multiple governmental agencies as well as his whistleblowing activities." The SEC argued Williky's claims of cooperation were exaggerated, but even if true, would not warrant a substantial reduction in the civil penalty. The district court found that the request for the maximum penalty was "excessive" and instead  decided

that a "penalty of $1,596,434, equal to two times the amount of disgorgement, is appropriate." The district court explained this was not the first time Williky had to settle a securities fraud dispute and that Williky had not taken responsibility for his actions by claiming he only committed insider trading because he was stressed and not thinking clearly. Finally, the district court found Williky's cooperation was "of limited value." Williky then filed a motion for reconsideration arguing the court did not accurately determine the extent of his cooperation. The district court denied the motion, having found "no misapplication of law" and characterizing Williky's arguments as a "disagreement with the conclusion and a bare assertion that the conclusion must have been due to a mistaken reliance on the evidence."

## II. DISCUSSION

Williky appeals the civil penalty of $1,596,434 for insider trading and asks this court to order a penalty of no more than $798,217. Williky argues that the trial court incorrectly assessed the value of his cooperation with federal authorities and ignored the fact he entered into a bifurcated settlement, which further proved his cooperation.

Along with other circuits, we review the district court's decision to impose a civil penalty for abuse of discretion. *SEC v. Happ*, 393 F.3d 12, 32 (1st Cir. 2004); *SEC v. Rajaratnam*, 918 F.3d 36, 41 (2d Cir. 2019); *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 781 (5th Cir. 2017). A court abuses its discretion only if "the record contains no evidence upon which the court could have rationally based its decision; the decision is based on an erroneous conclusion of law; the decision is based on clearly

erroneous factual findings; or the decision clearly appears arbitrary." *United States v. Z Investment Properties, LLC*, 921 F.3d 696, 698 (7th Cir. 2019) (numerical ordering omitted).

Both parties concur that in determining a civil penalty for violations of federal securities law, the court should generally consider factors such as: "the seriousness of the violation; the defendant's scienter; the repeated nature of the violations; whether the defendant has admitted wrongdoing; the losses or risk of losses caused by the conduct; any cooperation provided to enforcement authorities; and ability to pay." *SEC v. Zenergy Int'l, Inc.*, 2016 WL 5080423, at *16 (N.D. Ill. Sept. 20, 2016) (numerical ordering omitted); *see also SEC v. Custable*, 1996 WL 745372, at *2–5 (N.D. Ill. Dec. 26, 1996), *aff'd*, 132 F.3d 36 (7th Cir. 1997). These factors are certainly relevant, but we should also point out that the civil penalty for insider trading comes from its own independent statutory provision, the Insider Trading Sanctions Act. 15 U.S.C. § 78u-1(a)(2). Whereas typical civil penalties follow a three-tier system that are assessed per violation or are otherwise limited to the gross amount of ill-gotten gain, the Insider Trading Sanctions Act calculates the penalty as a multiple of the losses avoided due to insider trading. It is therefore clear that the overriding concern of the civil penalty against insider trading is to "effect general deterrence and to make insider trading a money-losing proposition." *Rajaratnam*, 918 F.3d at 41.

In this light, Williky's focus on the nobility of his whistle-blowing endeavors misses the mark since the civil penalty's main design is to deter insider trading, not to encourage whistleblowing and cooperation after the fact. Thus, absent any evidence of extraordinary cooperation, the most pertinent

facts on record are that Williky is a recidivist federal securities law offender who attempted to avoid responsibility in his district court proceedings and, on appeal, still fails to admit any wrongdoing related to insider trading. Given all of the facts and circumstances, the district court properly determined that a civil penalty was necessary to serve as an effective deterrent. Even when considering the factors the parties proposed, Williky has only addressed the cooperation he provided to federal authorities and made assertions about his innocence that are precluded by the terms of the bifurcated settlement stating he would accept the complaint as true.

The district court also properly weighed the value of Williky's cooperation. Williky argues that the award of two times the disgorgement amount "ignored Williky's cooperation with multiple governmental agencies as well as his whistle-blowing activities." Rather, the district court explicitly stated that his cooperation was of limited value. Williky further contends that the tape and evidence he provided were directly used in the indictment, prosecution and conviction of the criminal defendants in the Imperial fraud. The SEC argues that Imperial was under investigation before Williky's tip, that Williky never admitted his wrongdoing in his interviews with federal authorities, and that he was not an essential part of the criminal prosecution since he was not called to testify in Wilson's criminal trial. The SEC adds that all the documents that Williky provided were only given in response to compul-sory subpoenas. Here, the district court assessed the value of Williky's cooperation and determined his overall conduct did not warrant the maximum statutory penalty. We do not agree

that the district court abused its discretion in deciding to impose a civil penalty of two times Williky's avoided losses.

Finally, Williky also argues that he is entitled to a reduced penalty because he entered into a bifurcated settlement with the SEC. Williky seems to view this as another example of his cooperation and claims that the SEC consequentially spent little to no funds to prosecute him. Williky then cites a string of district court opinions to assert that courts assessing penalties in bifurcated settlements either do not assert a penalty or assert a penalty equaling the ill-gotten gain. Not only are all of these cases about the general statute providing for civil penalties as opposed to the Insider Trading Sanctions Act, but not one of the cited cases discusses the bifurcated settlement as a basis for determining the civil penalty. Regardless, even if entering into a bifurcated settlement may be a means of cooperation that merits consideration, Williky has been notably uncooperative throughout the course of litigation, from failing to answer the complaint in a timely manner to attempting to object to his deposition on flimsy grounds. The litigation has been pending for multiple years and the SEC has undoubtedly spent significant resources in litigating the matter against Williky. Allowing Williky to flagrantly commit insider trading and then settle to avoid civil penalties would create a perversive incentive that undermines the purpose of the statute.

## III. CONCLUSION

We conclude that the district court did not abuse its discretion in deciding to impose a civil penalty of $1,596,434 on Williky. The court adequately assessed the extent of Williky's cooperation and whistleblowing activities when it determined

to set a civil penalty equal to two times the amount of the losses he avoided. The judgment of the district court is AFFIRMED.