In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 23-3310, 24-1273 & 24-1289

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellee,*

*v.*

DAY PACER LLC, et al.,

*Defendants-Appellants,*

*and*

MARGARET E. CUMMING, in her capacity as personal representative of the Estate of David T. Cumming,

*Defendant-Appellant.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cv-01984 — **Lindsay C. Jenkins**, *Judge.*

_____

ARGUED OCTOBER 22, 2024 — DECIDED JANUARY 3, 2025

_____

Before BRENNAN, JACKSON-AKIWUMI, and KOLAR, *Circuit Judges.*

BRENNAN, *Circuit Judge*. The National Do Not Call Registry saves millions of consumers from unwanted communications. When telemarketers contact those on the registry, steep penalties can attach. The defendant companies here—Day Pacer LLC and EduTrek L.L.C.—as well as the individuals who ran them were responsible for millions of telemarketing calls to consumers on the registry. As a result, the Federal Trade Commission brought a civil enforcement action against them. The district court found the defendants liable on summary judgment and awarded the Commission over $28 million in civil penalties. The defendants appeal the court's liability findings and damages award.

We agree the defendants are liable and affirm the court on that front. For the companies, there is no genuine dispute of material fact that their practices are prohibited by the regulations, nor that they should have known their actions were deceptive. As for the individuals, all either knew or should have known of the companies' illegal acts, and all had authority to prevent them.

But we reverse and remand the decision to substitute an individual defendant's estate upon his death and the damages award. The Commission's suit here was a penal action, which never survives a party's death. Additionally, the district court did not consider all mandatory statutory factors, so its award was an abuse of discretion.

## I

We first review the regulatory backdrop to this case. In passing the Federal Trade Commission Act, Congress prohibited "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting

commerce." 15 U.S.C. § 45(a)(1). The Telemarketing and Consumer Fraud and Abuse Prevention Act was added in 1994, providing "consumers necessary protection from telemarketing deception and abuse." *Id.* § 6101(5).

The Commission has statutory authority to create rules defining unfair and deceptive acts. *Id.* § 57a(a)(1). It promulgated the Telemarketing Sales Rule (TSR) to implement the Telemarketing and Consumer Fraud and Abuse Prevention Act. *See* 16 C.F.R. pt. 310. The TSR defines telemarketing as a "plan, program, or campaign which is conducted to induce the purchase of goods or services … by use of one or more telephones." *Id.* § 310.2(hh).

Relevant here, the TSR prohibits telemarketing communications when the consumer's number is on the National Do Not Call Registry, subject to only two exceptions. *Id.* § 310.4(b)(1)(iii)(B). The telemarketer must either have (1) prior express written agreement demonstrating the telemarketer is allowed to call, or (2) an established business relationship with the consumer. *Id.* A party is also prohibited from providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer" is violating the TSR. *Id.* § 310.3(b).

The Commission can recover civil penalties from TSR violators who had "actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A). The maximum civil penalty is adjusted for inflation periodically, ranging from $16,000 to $42,530 per violation during the period at issue here. *See* 16 C.F.R. § 1.98(d). When fashioning a penalty, the district court may not

reflexively award the statutory maximum. It must consider "the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15 U.S.C. § 45(m)(1)(C).

Day Pacer LLC, and its predecessor EduTrek L.L.C., were companies that generated sales leads. Both purchased consumers' contact information from websites, usually job-search platforms, where the consumers had entered their information. The companies would then personally call those consumers or contract with other organizations—termed "IBT Partners"—to call them, gauging the consumers' interest in educational opportunities. If consumers expressed interest, the companies would sell their contact information to for-profit educational institutions.

Between 2014 and 2019, the companies placed approximately 3.7 million calls to consumers on the registry. Additionally, the IBT Partners purportedly transferred another nearly half-million calls to the defendants from consumers on the registry, totaling approximately 4.2 million calls.

During that same period, the companies received multiple complaints, including threatened lawsuits, from do-not-call consumers. Organizations from which the companies purchased information, and schools to which they sold the data, also lodged complaints, claiming that Day Pacer and EduTrek engaged in illegal or unethical practices. Finally, in April 2016, the Commission notified the companies that it was investigating their activities for possible violations of the FTC Act.

Raymond Fitzgerald and David Cumming, who served as managing members, were equity owners of both companies. As managing members, they had control over the businesses' activities, and were empowered to "do and perform all other acts as may be necessary or appropriate to the conduct of the [entities'] business."

Ian Fitzgerald was involved with Day Pacer and EduTrek in various capacities throughout the years.[1] He was the director of human resources at EduTrek and then became the president of Day Pacer in June 2016. This latter role gave him control over the entity's business and personnel decisions. He continued to serve as Day Pacer's president until that company dissolved in 2019.

In March 2019, the Commission sued the companies, Day Pacer and EduTrek, and the above-named individuals, alleging two counts. Count I asserted the defendants personally called, or caused others to call, consumers on the registry, violating the TSR. *See* 16 C.F.R. § 310.4(b)(1)(iii). Count II alleged the defendants provided "substantial assistance" to the IBT Partners, who themselves violated the TSR. *See id.* § 310.3(b). The Commission sought monetary and injunctive relief.

All parties moved for summary judgment. The district court issued a written opinion and order in which it first addressed a procedural issue that arose during motion practice. Cumming had passed away in early 2022, so the Commission sought to substitute his estate as a party. Our circuit permits substitution if the action is primarily remedial, rather than penal. *See Smith v. No. 2 Galesburg Crown Fin. Corp.*, 615 F.2d 407,

---

[1] Because Raymond and Ian share a last name, we refer to them by their first names.

413–15 (7th Cir. 1980), *overruled on other grounds by Pridegon v. Gates Credit Union*, 683 F.2d 182, 194 (7th Cir. 1982). The district court found that the penalties sought under the TSR were remedial, so it substituted the Estate for Cumming.

The court next found Day Pacer and EduTrek ("LLC Defendants") liable for calls made to consumers on the registry. It rejected three main arguments against liability. The LLC Defendants first argued they never actually sold anything to consumers, instead acting as mere intermediaries. Thus, they claimed they were not "telemarketers" under the TSR. But the court found that the TSR defines telemarketing more broadly as any "plan, program, or campaign" "conducted to induce the purchase of goods or services," which described the companies' activities. *See* 16 C.F.R. § 310.2(hh).

Second, the LLC Defendants asserted they did not have "knowledge fairly implied on the basis of objective circumstances" that the TSR prohibited their activities. *See* 15 U.S.C. § 45(m)(1)(A). But the court found that even if the companies did not subjectively know the TSR applied, there was no reasonable basis for them not to know its applicability—especially considering they knew an analogous statute governed. Third, the LLC Defendants contended they had received prior express consent from consumers to be called. The court responded that consent given to vendors from whom the companies purchased the information was not sufficient; consumers must consent to each separate caller. Additionally, consumer consent after the call was placed was too late, as callers must have written consent before placing the call.

The court also found the companies liable under Count II, for "substantially assisting" one of its IBT Partners in

violating the TSR. Although there were multiple IBT Partners, the Commission sought summary judgment as to only one, as it needed to prove just a single instance to prevail on Count II.

The last liability issue concerned Raymond, Ian, and Cumming ("Individual Defendants"). To hold them liable for the companies' actions, the Commission was required to demonstrate these individuals had control or authority to control the practices, and that they knew or should have known about the violations. Given the authoritative positions each individual had and their knowledge of the multiple complaints the companies received, the district court found these elements were satisfied.

The court next addressed relief. It said it was "inclined" to grant injunctive relief against the LLC Defendants, as well as Raymond and Ian ("Day Pacer Defendants"), but required supplemental briefing on each party's current state of affairs. It also expressed an "inclination" to award a $28.6 million penalty—representing the companies' gross revenue from the period of malfeasance—against all defendants. But it reserved the final award for after the parties provided updated information. And because Cumming was deceased, the court concluded he had no ongoing role in the affairs of the LLC Defendants and intended to deny injunctive relief as to the Estate.

A few months later, the court issued a permanent injunction prohibiting the Day Pacer Defendants from engaging in any telemarketing, whether or not prohibited by the TSR. It then stayed the injunction pending appeal only to the extent that it prohibited them from calling other businesses. Finally, the court issued a four-page order imposing the full $28.6

million penalty, with joint and several liability, on all defend-
ants. The order was silent as to a few of the required statutory
factors, most notably the parties' ability to pay. *See* 15 U.S.C.
§ 45(m)(1)(C).

## II

The defendants bring two challenges to the district court's
liability finding. First, the LLC Defendants argue that the
court improperly granted summary judgment against the
companies. Second, they posit that even if the LLC Defend-
ants were liable for the telemarketing calls, the court still erred
in holding all three Individual Defendants liable for the com-
panies' actions.

Both liability challenges are reviewed de novo,
"construing the evidence in the light most favorable to the
non-moving partes." *Navratil v. City of Racine*, 101 F.4th 511,
518 (7th Cir. 2024). Summary judgment is appropriate when
"there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." FED. R.
CIV. P. 56(a).

## A

The LLC Defendants raise three main arguments as to
why the companies were not liable for the calls. They first as-
sert the TSR did not prohibit their activities, as the calls were
"purely informational." Second, they believe there was still a
genuine issue of material fact whether the companies knew or
should have known that the TSR outlawed their calls. Third,
they claim that the companies telemarketed only to individu-
als who had consented to the calls. We address each argument
in turn.

The companies were not telemarketing at all, they assert, as their calls were "purely informational." They did not offer to sell any goods or services to the do-not-call consumers directly. But, as the Commission points out, the regulation's definition of "telemarketing" is not so limited. Rather, a party violates the regulation any time it is involved in "a plan, program, or campaign which is conducted to induce the purchase of goods or services." 16 C.F.R. § 310.2(hh). Even though the companies never sold educational services on the contested calls, their business models were structured around a "plan" to obtain caller information to sell to for-profit universities, who would then attempt to sell educational services.

Consider the possible consequence of the LLC Defendants' reading of the regulations: Nothing would stop a company from establishing a sister organization to generate its leads from do-not-call individuals. That lead-generation organization would be able to obtain the necessary express consent for the principal organization to then place telemarketing calls. But the regulations do not permit such a loophole. Instead, they define "telemarketing" more broadly than just the act of selling goods or services.

The companies argue next that they did not know, and had no reason to know, that the TSR prohibited their calls. The Commission counters that actual knowledge is not needed, as the statute only requires knowledge under an objective standard.

Subjective knowledge that actions violate the TSR is not necessary for liability to attach. Rather, it is enough to have "actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A). The

LLC Defendants point to three pieces of evidence they say show the companies did not have the requisite knowledge. None of the three are persuasive.

Ian and Raymond asserted in declarations they believed that selling services directly over the phone would violate the TSR, but serving as an intermediary for educational institutions would not. Their beliefs may show the companies did not have actual knowledge of wrongdoing. But it is not objectively reasonable merely to believe that a law does not prohibit their activities. Ignorance of the law's reach is not a defense.

Cumming posited in an affidavit that he "did some research" on the TSR's applicability to the companies' activities, ultimately concluding that the law did not prohibit the calls made. But that research was not proffered during the summary judgment proceedings. Although a party's affidavit can serve as a vehicle for introducing facts at summary judgment, the party "cannot rest 'upon conclusory statements in affidavits; [he] must go beyond the pleadings and support [his] contentions with proper documentary evidence.'" *Foster v. PNC Bank, Nat'l Ass'n*, 52 F.4th 315, 320 (7th Cir. 2022) (quoting *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021)). Because Cumming did not cite any documentary evidence for summary judgment, the assertion in his affidavit was not entitled to any weight.

One evidentiary matter remains bearing on the companies' objective knowledge. That concerns Ian and Raymond's affidavit statements that the Utah Division of Consumer Protection investigated Day Pacer for violating a Utah law similar to the TSR. They submit that the state ultimately did not find Day Pacer in violation of that law. If the state had cleared Day

Pacer of wrongdoing under a law materially similar to the TSR, that may have made it objectively reasonable to conclude there was no violation of federal law. But this dispute fails for the same reason as Cumming's research: no evidence related to the Utah investigation was introduced at summary judgment. The district court was not bound to accept bare statements in affidavits unsupported by "proper documentary evidence." *Weaver*, 3 F.4th at 934.

In contrast, the Commission produced admissible evidence demonstrating that it was not objectively reasonable for the LLC Defendants to believe that the TSR did not prohibit their calls. One of EduTrek's 2014 contracts expressly prohibited its contractors from violating the TSR, showing that defendants were aware of the law and its potential applicability. The Individual Defendants also admitted they knew that the Telephone Consumer Protection Act (TCPA) and its accompanying regulations governed their activities. *See* 47 U.S.C. § 227. The defendants offered no explanation for how it was reasonable to conclude the TCPA applied to their businesses, yet the essentially equivalent TSR did not.[2]

In sum, although the defendants may have survived summary judgment on whether they had actual knowledge of TSR violations, they were not entitled to proceed to trial given the statute's objective standard here.

---

[2] The TCPA prohibits "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 U.S.C. § 227(a)(4). It is hard to see how there is not significant overlap with the TSR's prohibition against any "plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution." 16 C.F.R. § 310.2(hh).

The last argument against the LLC Defendants' liability is that the companies limited any telemarketing to consumers who solicited or consented to the calls. The Commission responds that the companies did not obtain the form of consent required by the regulation.

The TSR requires "express agreement, in writing" from any consenting consumer. 16 C.F.R. § 310.4(b)(1)(iii)(B)(1). But that agreement does not provide carte blanche for all telemarketers to then call that consumer. Rather, the agreement only authorizes "calls made by or on behalf of a specific party" named in the agreement. *Id.* The defendants argue this exception was met in two ways.

First, they submit that the consumers provided consent to the websites from which the defendants purchased the consumers' information, and that this consent was broad enough to apply to the defendants. In support, they contend the companies provided millions of URLs purporting to document consent. The Commission responds that when it tested the URLs, they either led to a blank webpage, or did not demonstrate consent as to the companies.[3] It then alerted the defendants in its proposed statement of material facts of the problems with the URLs. The defendants disputed that the URLs were broken and faulted the Commission for not using a certain method to retrieve the webpages. But even after being put on notice of the problems with the links, the

---

[3] The Commission says it tested 750 of the 11,308,260 links provided, and all 750 were defective. It then provided a declaration in which its expert explained that 750 is a proper sample size from which to extrapolate these results to the rest of the population. Defendants argue that extrapolation was impermissible—why, they do not say—but put on no evidence to support that claim.

defendants provided no evidence—via screenshots, PDFs, or the like—proving consumer consent. They thus did not meet their burden of demonstrating express written agreement.

For the second consent argument, the defendants assert that consumers acquiesced after initially speaking to the companies. But consent can be proved only by "express agreement, in writing." 16 C.F.R. § 310.4(b)(1)(iii)(B)(1). Therefore, under the plain text of the regulation, oral consent does not qualify. The district court correctly concluded that the defendants did not have consumer consent to place the calls.

Related to consent, the LLC Defendants argue that the Commission did not adequately show the companies had knowledge that they lacked consumer consent. But that puts a burden on the FTC where one does not exist. The TSR requires the telemarketer, not the Commission, to "demonstrate that the seller has obtained" express consent. 16 C.F.R. § 310.4(b)(1)(iii)(B)(1). And express consent in the telemarketing context is "an affirmative defense for which the defendant bears the burden of proof." *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1118–19 (9th Cir. 2022) (interpreting the similar consent provision of the TCPA). Thus, that the Commission could only "point to a handful of complaints" is irrelevant. The LLC Defendants had the burden to establish express consent, and as shown above, they did not carry it here.

Although no party raised this issue on appeal, an additional topic related to the companies' liability arose at oral argument. The district court found the entities liable for the millions of "outbound telephone calls" they placed to consumers. The TSR defines an "outbound telephone call" as one "initiated by a telemarketer to induce the purchase of goods

or services or to solicit a charitable contribution." 16 C.F.R. § 310.2(x). Because this provision lacks the broad "plan, program, or campaign" language present in the general telemarketing provision, one could argue that an outbound telephone call is illegal only if that call itself induces the purchase of a good or service.

But this reading does not carry the day for the LLC Defendants in this case. As discussed previously, telemarketing is defined broadly as "a plan, program, or campaign which is conducted to induce the purchase of goods or services." *Id.* § 310.2(hh). And a telemarketer is one "who, in connection with telemarketing, initiates or receives telephone calls to or from a customer." *Id.* § 310.2(gg). One thus qualifies as a telemarketer any time he calls a customer within the broad definition of telemarketing. Throughout the TSR, the phrases "outbound telephone call" and "telemarketer" are used in the same sentence, and by referencing telemarketing—a term defined in the regulation—those references incorporate that definition.

In addition, the regulations differentiate a seller—who "provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration"—from a telemarketer. *Id.* § 310.2(ee). The latter is defined more broadly as one who engages in a "plan, program, or campaign" to induce the purchase of services. *Id.* § 310.2(gg). If the TSR had wanted to limit liability for outbound calls only to calls that actually offer to sell services, it could have defined outbound calls as those placed by sellers, not by the more broadly defined telemarketers. When considering that the regulation prohibits outbound calls placed by telemarketers, not just sellers, we are satisfied that it does not

permit calls by lead generators such as Day Pacer and EduTrek.

**B**

The defendants argue that even if the companies were liable for TSR violations, the individuals were not. To impose individual liability for an entity's TSR violations, the Commission "must prove (1) that the practice violated the [FTC Act]; (2) that the individual 'either participated directly in the deceptive acts or practices or had authority to control them'; and (3) that the individual 'knew or should have known about the deceptive practices.'" *F.T.C. v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 769 (7th Cir. 2019) (quoting *F.T.C. v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005)). The first element is not addressed here, as that was satisfied in holding the companies liable.

For the second element, Raymond and Cumming's Estate dispute the degree of actual control the individuals exercised over the companies' decisions. Although our circuit has not dealt in depth with the "authority to control" element, the Second Circuit's recent analysis is instructive. In *F.T.C. v. Moses*, the court held an individual liable for entities' deceptive practices when he "held a 50 percent ownership stake" in them, and "served as their co-director and general manager." 913 F.3d 297, 307 (2d Cir. 2019). Important to this liability finding was that the individual "admitted to having the power to hire and reprimand employees including those responsible for the Corporate Defendants' violations." *Id.* So, although there may have been a dispute about "whether he *exercised* authority to control the Corporate Defendants' conduct," there was no legitimate basis to deny that "he *possessed* authority to control it." *Id.* at 308.

So too here. Raymond and Cumming were the largest equity owners of both EduTrek and Day Pacer. For EduTrek, Raymond held a 72% interest and Cumming 21%. For Day Pacer, Raymond held a 66% interest and Cumming 19.5%. Even though Cumming's ownership interest fell short of that of a "controlling shareholder," it is undisputed that he and Raymond were managers of both companies. Managers were entitled to "do and perform all … acts as may be necessary or appropriate to the conduct of the [companies'] business." These broad powers necessarily include "the power to hire and reprimand employees including those responsible for the Corporate Defendants' violations." *Moses*, 913 F.3d at 307. Accordingly, even if there was a genuine dispute over whether Raymond and Cumming exercised authority over the companies' deceptive practices, the record undercuts a claim that they did not possess authority over them.

The defendants also dispute that Raymond and Cumming should have known about the entities' deceptive practices. But both were aware that the companies had been sued multiple times for calling consumers on the registry. It strains credulity that "only a handful of complaints" were insufficient to put them on notice of possible TSR violations. That position is further belied by Raymond's representation of the entities in the lawsuits. There is also no dispute that both individuals were aware of non-lawsuit complaints filed against the companies due to calling numbers on the registry. The record thus shows that Raymond and Cumming knew, or at least should have known, of the companies' deceptive actions. So, the district court correctly held them individually liable.

As an aside, the Estate also argues that the district court should have allowed it to remedy Cumming's litigation errors

before ruling in the Commission's favor at summary judgment. Precedent forecloses this argument. When a party is substituted for a deceased person under Federal Rule of Civil Procedure 25(a), the new party "tracks the positions of the original litigant[]." *Brook, Weiner, Sered, Kreger & Weinberg v. Coreq, Inc.*, 53 F.3d 851, 852 (7th Cir. 1995). Specifically, if the deceased party "failed to comply with its discovery obligations, leading the judge to deem a critical fact established," the successor has no right to change that decision. *Id.* The Estate was not entitled to a second bite at the apple.

Now to Ian Fitzgerald. He argues that 61% of the violations occurred from March 22, 2014, to July 31, 2016, but he had no authority to control the Corporate Defendants' operations before June 2016. The Commission responds that, beginning in 2010, Ian was the president of Raymond's holding company that owned EduTrek and Day Pacer. It also points out that Ian was subjectively aware of complaints the companies received.

There is little argument against Ian's liability for Day Pacer's calls after he became president of the company in June 2016. As a corporate officer, he had authority to control Day Pacer's decisions. *See World Media Brokers*, 415 F.3d at 764 (authority to control can be shown by "assuming duties as a corporate officer"). He also disputes that he should have known about Day Pacer's deceptive practices. But it is undisputed that the company received complaints, including lawsuits, from consumers on the registry after Ian became president. And the company was notified multiple times by vendors of practices that the vendors flagged as illegal. Thus, even if Ian did not subjectively know about all these complaints, a president of a telemarketing business should know of these

lawsuits and violations, which is all that is needed to meet the objective knowledge requirement.

As to the companies' activities before Ian became president, however, the Commission did not demonstrate that he had authority to control the entities' actions. Again, there is no genuine dispute that Ian did not "kn[o]w … about the deceptive practices." *Credit Bureau Ctr.*, 937 F.3d at 769. In response to a 2015 lawsuit filed by a do-not-call consumer against EduTrek, Ian told other employees in an email that "[w]e need to make sure our system is not calling DNC numbers ever."

Yet even with this email, there is no evidence that Ian had authority to direct the companies' actions before he became president in June 2016. Before then, the Commission agrees, he served as director of human resources for the two entities. No evidence was put forth showing how a human resources role would provide Ian control over the companies' decisions on legal compliance. The Commission submits that Ian should be liable as president of Raymond's holding company, which itself owned an interest in the entities. But serving as the holding company's president is one step removed from being a shareholder in its subsidiaries. So, there is no "substantial inference" that Ian could control the deceptive acts. *F.T.C. v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1205 (10th Cir. 2005). There is no evidence that Ian took over Raymond's voting powers, nor that he had any direct say in the entities' operations. The Commission therefore failed to carry its burden of demonstrating that Ian "participated directly in the deceptive acts or practices or had authority to control them." *Credit Bureau Ctr.*, 937 F.3d at 769 (quoting *World Media Brokers*, 415 F.3d at 764).

Last, the Commission contends that Ian's pre-2016 liability stems from his equity ownership in Day Pacer, which was established in September 2015. Ian owned a 9.5% interest in the entity through his limited liability company. This ownership interest is not "controlling," so in isolation falls short of creating a "substantial inference" that the owner has authority to control the entity's decisionmaking. *See Freecom*, 401 F.3d at 1205. And unlike Raymond and Cumming, he was not designated as a manager of the entity, so his powers did not include hiring and reprimanding those responsible for TSR violations. In sum, Ian's equity ownership of Day Pacer does not demonstrate authority to control its decisions. He is thus only personally liable for the entity's actions after he assumed an officer position.

## III

The Estate argues next that even if Cumming was individually liable for the companies' TSR violations, the district court improperly substituted it into the litigation upon his death. *See* FED. R. CIV. P. 25(a). The Commission responds that the Estate was properly substituted in as a party.

We review the district court's substitution decision de novo for legal issues, while factual findings are reviewed for clear error. *Russell v. City of Milwaukee*, 338 F.3d 662, 665 (7th Cir. 2003).

Our circuit holds that "actions for penalties do not survive" a party's death, yet remedial actions do. *Smith v. No. 2 Galesburg Crown Fin. Corp.*, 615 F.2d 407, 414–15 (7th Cir. 1980), *overruled on other grounds by Pridegon v. Gates Credit Union*, 683 F.2d 182, 194 (7th Cir. 1982); *see also Parchman v. SLM Corp.*, 896 F.3d 728, 738 (6th Cir. 2018) (same). The distinction

between penal versus remedial turns on three factors: "(1) whether the purpose of the action is to redress individual wrongs or wrongs to the public; (2) whether recovery runs to the individual or to the public; (3) whether the authorized recovery is wholly disproportionate to the harm suffered." *Smith*, 615 F.2d at 414; *Parchman*, 896 F.3d at 738.

First, the Commission asserts that the purpose of the action is safeguarding individual rights, not protecting the public as a whole. The Estate argues that the focus must be on the specific enforcement action, rather than the statutory scheme writ large. And, the Estate continues, this action was brought primarily to redress wrongs to the public. The Estate relies on *Smith* for its view, but that decision did not take such a narrow approach. Rather, *Smith* expressly considered the "statutory scheme" and "the entire focus of the legislation." 615 F.2d at 414.

The Sixth Circuit's analysis in *Parchman* on this score is instructive, as it dealt with the analogous TCPA.[4] *See* 47 U.S.C. § 227. That circuit held that the TCPA's purpose, as clarified in express congressional findings, was to "protect individuals from the harassment, invasion of privacy, inconvenience, nuisance, and other harms associated with unsolicited,

---

[4] As discussed above, the TSR and TCPA prohibit many of the same telemarketing activities. *See supra* note 2. The TCPA makes illegal any communications to consumers on the registry "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services," while the TSR forbids any "plan, program, or campaign which is conducted to induce the purchase of goods or services." 47 U.S.C. § 227(a)(4); 16 C.F.R. § 310.2(hh). Due to this overlap, TCPA cases may be persuasive in the TSR context, at least in discerning the statute's overarching purpose—the aim of the first *Smith* factor.

automated calls." 896 F.3d at 738. Simply because "the harm is widely shared does not mean it is a general public wrong." *Id.* at 739. Rather, the harms are "felt by identifiable individuals, as individuals." *Id.* And our circuit, when deciding how broadly to construe the TCPA in favor of consumers, has joined other circuits in describing the statute as remedial due to its emphasis on consumer protection. *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 967 (7th Cir. 2020); *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013); *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharms., Inc.*, 847 F.3d 92, 96 (2d Cir. 2017).

So too here, the congressional findings behind the TSR state that consumers "are estimated to lose $40 billion a year in telemarketing fraud," and that "consumers are victimized by other forms of telemarketing deception and abuse." 15 U.S.C. § 6101(3)–(4).[5] Responding to these concerns, Congress enacted "legislation that will offer consumers necessary protection from telemarketing deception and abuse." *Id.* § 6101(5). These congressional findings show the TSR was promulgated with the same consumer-centric focus as the TCPA. This factor thus cuts in favor of finding this action remedial.

Second, the Estate and the Commission agree that the recovery here flows to the government, which points toward finding the action penal, not remedial. *See Smith*, 615 F.2d at 414; *Parchman*, 896 F.3d at 740.

---

[5] The Commission promulgated the TSR to carry out 15 U.S.C. §§ 6101–6108. *See* 16 C.F.R. § 310.1 (identifying the statutory source of the TSR).

Third, *Smith* provides that an action is likely penal when its authorized recovery is greatly disproportionate to the harm inflicted. 615 F.2d at 414. The core dispute here is around the term "authorized." The Estate argues that the authorized penalty is the statutory maximum, over $107 billion. This represents the maximum per-violation penalty, multiplied by nearly 4.2 million illegal calls. The Commission responds that the statute requires the court to consider various factors in imposing the penalty, so it cannot just automatically award the statutory maximum. Instead, it submits that we should look only to the award the district court fashioned.

But the Commission's assertion is incorrect. *Smith* borrowed its three-part test from a Sixth Circuit case with the same factors. *See* 615 F.2d at 414 (citing *Murphy v. Household Fin. Corp.*, 560 F.2d 206, 209 (6th Cir. 1977)). And *Murphy*'s third prong was "whether the recovery authorized *by the statute* is wholly disproportionate to the harm suffered." 560 F.2d at 209 (emphasis added). Further, the Supreme Court case *Murphy* relied on discussed "[p]enal laws," not just penal awards. *See Huntington v. Attrill*, 146 U.S. 657, 667–68 (1892). We must therefore look to the recovery authorized by the statute in discerning whether the action is remedial or penal, not simply the ultimate award.

The Commission is correct, however, that at least for this statute, we cannot consider only the statutory maximum. The district court is not permitted to award that maximum in all instances. Rather, it must consider all statutory factors when fashioning its award. *See* 15 U.S.C. § 45(m)(1)(C). So, if it reflexively awarded only the maximum, such an award would not be "authorized." A court is "authorized" to act only if it has "official permission" or "formal approval." OXFORD

ENGLISH DICTIONARY (3d ed. 2014); *see also WEC Carolina Energy Sols. LLC v. Miller*, 687 F.3d 199, 204 (4th Cir. 2012) (defining "authorization" as "formal warrant, or sanction"). The court does not have "official permission" or "sanction" to award the statutory maximum in all cases, without adjusting that award as the statutory factors require. Doing so would constitute an abuse of discretion.

The statutory maximum cannot be the only consideration. Yet, when read in light of other provisions in the FTC Act, under § 45(m) the district court may grant an award that is not tied to any underlying harm. *See Maracich v. Spears*, 570 U.S. 48, 65–68 (2013) (instructing that statutory provisions should "be construed within the context of the [Act] as a whole"). Section 57b allows courts to "grant such relief as the court finds necessary to redress injury to consumers or other" parties injured by deceptive practices. 15 U.S.C. § 57b(b). But this provision allows damages only to compensate for concrete harms, barring "the imposition of any exemplary or punitive damages." *Id.* The damages are only compensatory because this provision is strict liability: plaintiffs can recover regardless of the defendant's mental state.

To the contrary, § 45(m) imposes a mens rea requirement. The defendant must have "actual knowledge or knowledge fairly implied on the basis of objective circumstances" that he violates the law. *Id.* § 45(m)(1)(A). This knowledge requirement explains why there is no limitation on damages only to "redress injury to consumers." *See Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 108 F.4th 458, 496–97 (7th Cir. 2024); *Eisenhour v. County*, 897 F.3d 1272, 1281 (10th Cir. 2018) (discussing the connection between mens rea and punitive damages). Thus, the government is not prohibited from seeking punitive

damages, allowing the court to punish each violation with an award in the tens of thousands of dollars. *See* 16 C.F.R. § 1.98. Although the court may not award the statutory maximum in all instances, it is authorized to impose damages "wholly disproportionate to the harm suffered." *Smith*, 615 F.2d at 414. This factor accordingly cuts in favor of finding the action penal.

In sum, we recognize that the statute's purpose may be remedial. But the recovery flows to the federal treasury and, once § 45(m) is read against other provisions of the FTC Act, it is apparent that the authorized recovery can be disproportionate to any harm. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167–69 (2012) (discussing the need to construe a statute as a whole). These two factors demonstrate that the action is penal. Under *Smith*, the district court's damages award did not survive Cumming's death, so the Estate was improperly substituted.

## IV

The defendants challenge the district court's damages award in three ways. First, they assert the $28 million civil penalty was excessive, as it is grossly disproportionate to any harm suffered from the telemarketing calls. They also claim the court's calculation was procedurally improper, as it did not consider required statutory factors. The Commission counters by arguing the court did not abuse its discretion in determining the award.

Second, the defendants take issue with the district court's decision to make the award joint and several. They argue that the award instead should have been assessed against each individual. The Commission responds that the district court

already performed an individualized assessment at the liability phase, so it did not need a second analysis at the penalty stage. Third, the Day Pacer Defendants claim the district court improperly considered all transfers made by IBT Partners in fashioning its award, despite only making factual findings as to one of them. The Commission responds the transferred calls were properly considered, and even if not, they made an immaterial difference in the court's award.

## A

Our court reviews the district court's civil penalty award for abuse of discretion. *S.E.C. v. Williky*, 942 F.3d 389, 393 (7th Cir. 2019). Reversal if proper only if "the record contains no evidence upon which the court could have rationally based its decision; the decision is based on an erroneous conclusion of law; the decision is based on clearly erroneous factual findings; or the decision clearly appears arbitrary." *Id.* (quoting *United States v. Z Inv. Props., LLC*, 921 F.3d 696, 698 (7th Cir. 2019)).

The defendants first argue the district court erred by imposing a penalty equal to gross income, rather than basing it on harm inflicted. We disagree. Our court dealt with a similar issue in *United States v. Dish Network L.L.C.*, 954 F.3d 970 (7th Cir. 2020). There, DISH violated the TSR, the TCPA, and a host of similar state laws for contacting do-not-call consumers. *Id.* at 973. The district court awarded $280 million in damages against DISH, which represented 20% of the company's annual profits. *Id.* at 980. We ruled that this award was impermissible, as it was based "entirely on DISH's ability to pay." *Id.* Some of the statutes at issue there—the TCPA and certain state laws—did not list "ability to pay as even a permissible factor," so the damages issue was remanded for further

consideration. *Id.* Our court cautioned that, even under statutes that permit considering defendants' ability to pay, to ensure any penalty is "within a constitutionally allowable range … the best way to do this is to start from harm rather than wealth," adjusting that number as the district court sees fit. *Id.*

In *Dish*, our court said that the legal system typically "bases civil damages and penalties on harm done." *Id.* But it pointed out that lawmakers "can change this norm," usually by permitting courts to consider other factors. *Id.* That is precisely what § 45(m) did. When fashioning an award, the court must consider four mandatory factors, none of which is consumer harm. 15 U.S.C. § 45(m)(1)(C). As discussed above, *see supra* Section III, the provision's punitive nature means the court is not limited to fashioning an award only to compensate for demonstrable harm. A different section of the FTC Act accomplishes that. *Id.* § 57b(b).[6] Rather, the section at issue here was meant to impose a greater punishment on violators who had knowledge—either "actual" or "fairly implied"—of their wrongdoing. *Id.* § 45(m)(1)(A).[7]

---

[6] This section directs courts to fashion an award that is "necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice." 15 U.S.C. § 57b(b). To the contrary, § 45(m) does not contain any language limiting awards to consumer redress.

[7] The defendants' argument that the district court's award conflicts with *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 1341 (2021), is misplaced. That case held that the FTC Act's provision authorizing injunctive relief does not allow a court to award equitable monetary relief. *Id.* at 1347 (citing 15 U.S.C. § 53(b)). It did not address whether disgorgement would be proper under the provision at issue here, § 45(m).

To be sure, *Dish* held that the FTC Act does not permit the defendant's wealth "to be the sole factor" in fashioning an award. 954 F.3d at 980. This is true, as § 45(m) directs the court to consider numerous other ones. That leads us to the defendants' second challenge to the award: that the district court did not consider all mandatory factors. Section 45(m)(1)(C) requires the court to consider "degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." When statutes mandate consideration of factors, a district court must "sufficiently explain its decision to show us that it considered" them. *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 490 (7th Cir. 2007). "A rote statement that the judge considered all relevant factors will not always suffice." *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005).

In its initial summary judgment order, the court requested additional briefing on the defendants' ability to pay, as well as "the effect any penalty would have on" the entities' ability to continue to do business. The Estate filed a brief that included a section discussing its ability to pay and its assets, which all other defendants "joined." Although the non-Estate defendants did not divulge their assets in this round of briefing, the district court could have considered their financial estimates provided earlier in the litigation. But in its $28.6 million damages award order, the district court did not discuss the defendants' ability to pay. Nor did it address their financial wherewithal elsewhere in the record.

The court also did not make any findings as to the companies' ability to do business. While Raymond asserted that Day Pacer is no longer in operation, the Commission noted that

the entity still had an active corporate registration. If Day Pacer was truly non-operational, the district court did not need to dwell on this factor. But because the record is silent as to its status, we do not know whether that factor should have played a larger role in the damages award calculation. That these two factors are missing makes it impossible to conclude the district court "considered the relevant factors," *Patton*, 480 F.3d at 490, and was an abuse of discretion.

Third, the Day Pacer Defendants submit that the district court improperly considered all calls placed by the IBT Partners when fashioning its award, even though it made express findings only as to one, Bluewater. The companies themselves were responsible for 3,669,914 illegal calls, while the IBT Partners transferred another 498,597 illegal calls to the LLCs. But there were dozens of IBT Partners, with Bluewater accounting for only a small fraction of those nearly half-million illegal calls.

The district court imputed all IBT Partners' illegal calls to the defendants for purposes of calculating the award, despite making factual findings only as to Bluewater. But the defendants cannot be held liable for actions on which the district court did not make findings. On remand, the district court should consider solely the companies' 3,669,914 calls, as well as Bluewater's share of the 498,597 inbound transfer calls.

We do not take a position on whether the dollar amount of the award, standing alone, constituted an abuse of discretion. Rather, we hold only that the district court abused its discretion in the procedures used to arrive at the award.

**B**

The defendants assert the district court erred in imposing joint and several liability, rather than performing an individualized assessment for each defendant. The Commission responds that the district court already performed an individualized assessment at the liability phase, so it did not need a second analysis at the penalty stage.

The defendants' argument runs headlong into our precedent. This court has repeatedly held individuals jointly and severally liable without undertaking individual § 45(m) analyses for each defendant. *See World Media Brokers*, 415 F.3d at 763–66; *F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 632, 635–38 (7th Cir. 2005). Joint and several liability is appropriate whenever a plaintiff can "establish that each defendant acted in concert to 'produce a single, indivisible injury.'" *Harper v. Albert*, 400 F.3d 1052, 1061–62 (7th Cir. 2005) (quoting *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985)). And defendants act in concert when there exists an "agreement to cooperate in a particular line of conduct or to accomplish a particular result." RESTATEMENT (SECOND) OF TORTS § 876 cmt. a. If multiple defendants "jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recover only once for the full amount." *Honeycutt v. United States*, 581 U.S. 443, 447–48 (2017).

Here, each injury—communication to a do-not-call consumer—is indivisible as to each defendant. And as established when holding each individual liable for the companies' actions, Raymond and Ian cooperated to achieve each injury. They were on extensive email chains with one another, discussed complaints against the companies together, and formulated business plans together. Accordingly, the district

court appropriately imposed joint and several liability on Ian and Raymond after finding them individually liable for the entities' acts.[8]

Although joint and several liability is appropriate when the injury is indivisible, as discussed in Section II.B, Ian is not liable for calls placed before he became president of Day Pacer. The Commission has shown it has data available to determine when all calls occurred. As such, the district court should review that information and impose liability for pre-June 2016 TSR violations solely on the entities and Raymond.

**V**

The Day Pacer Defendants assert that the district court's injunction is too broad. The court prohibited them from "participating in Telemarketing or assisting others engaged in Telemarketing, whether directly or through an intermediary." It defined telemarketing as "any plan, program, or campaign which is conducted to induce the purchase of goods or services by use of one or more telephones, and which involves a telephone call, whether or not covered by the Telemarketing Sales Rule."

Instead, the Day Pacer Defendants believe the court should have enjoined them only from (1) calling consumers on the registry and (2) telemarketing calls related to for-profit education companies. They further argue that the injunction as written would interfere with their livelihoods. The Commission responds that injunctions are often not limited to

---

[8] Cumming also participated, but recall we have concluded that the Estate was improperly substituted. Therefore, the Estate cannot be jointly and severally liable for the award.

preventing the exact harm giving rise to the injunction, but usually sweep in additional activity.

We review the district court's injunction for abuse of discretion. *S.E.C. v. Yang*, 795 F.3d 674, 681 (7th Cir. 2015). The court has wide latitude in fashioning broad equitable relief. Indeed, it "is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. … [I]t must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity." *F.T.C. v. Ruberoid Co.*, 343 U.S. 470, 473 (1952).

The Fourth Circuit recently dealt with a district court order enjoining similar misconduct. The defendant had violated the TSR by fraudulently selling foreign rental properties. *F.T.C. v. Pukke*, 53 F.4th 80, 97–98 (4th Cir. 2022). The district court enjoined him from "any and all telemarketing activity whatsoever," not just telemarketing violating the TSR. *See In re Sanctuary Belize Litig.*, 482 F. Supp. 3d 373, 469 (D. Md. 2020). The Fourth Circuit affirmed the injunction over an overbreadth challenge, noting that the Commission can "seek injunctions framed 'broadly enough to prevent [defendants] from engaging in similarly illegal practices in future advertisements.'" *Pukke*, 53 F.4th at 110 (quoting *F.T.C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965)).

The district court's relief here, while broad, was not an abuse of discretion. Given the defendants' flagrant misconduct—illegally calling millions of registry consumers—a broad injunction was warranted.

Raymond and Ian complain that the injunction improperly restricts their ability to earn a living. For instance, Raymond asserts he is still a partner at a law firm, and the terms

of the injunction would prohibit him from selling services to potential clients. Ian points out that he owns a new telemarketing business, but that this business sells goods and services only to other businesses—an activity not prohibited by the TSR. Without question, the district court's injunction may inhibit the defendants' ability to earn money legitimately. But that consequence should have been contemplated before placing millions of illegal telemarketing calls.

The district court acted within its wide discretion in prohibiting not only calls that violate the TSR, but also communications that may possibly result in a violation. Indeed, the injunction effectively "close[s] all roads to the prohibited goal," even if it includes some legal activity. *Ruberoid Co.*, 343 U.S. at 473.

*       *       *

The judgment of the district court is affirmed, other than its calculation of damages and its decision to substitute the Estate as a party. Those two sections of its summary judgment orders are reversed, and we remand the case for further proceedings consistent with this opinion.