In the
# United States Court of Appeals
## For the Seventh Circuit

No. 17-3111

UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellees*,

*v.*

DISH NETWORK L.L.C.,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 09-3073 — **Sue E. Myerscough**, *Judge*.

ARGUED SEPTEMBER 17, 2018 — DECIDED MARCH 26, 2020

Before EASTERBROOK, KANNE, and BRENNAN, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. After a bench trial that lasted five weeks and produced 475 typed pages of findings, a district judge concluded that DISH Network and its agents committed more than 65 million violations of telemarketing statutes and regulations. 256 F. Supp. 3d 810 (C.D. Ill. 2017) (183 printed pages). The penalty: $280 million. DISH does

not challenge any finding of fact. This simplifies the appellate task, but legal issues remain.

DISH sold its satellite TV service through its own staff plus third parties. These fell into three categories. DISH hired "telemarketing vendors" to conduct campaigns on its behalf. It used thousands of "full service retailers" that sold, installed, and serviced satellite gear and service in their areas. Finally, it had some 50 "order-entry retailers", which used phones to sell nationwide. The order-entry retailers took orders from customers and entered them directly into DISH's computer system. DISH was responsible for installing the necessary equipment and received payments from the customers, remitting to the order-entry retailers a commission for each new customer. This appeal concerns the acts of DISH and four order-entry retailers: Dish TV Now, Star Satellite, JSR, and Satellite Systems Network.

The United States, California, North Carolina, Illinois, and Ohio filed suit against DISH, alleging violations of federal and state laws. The district court found that DISH and its agents violated the Telemarketing Sales Rule, 16 C.F.R. §310 (propagated under 15 U.S.C. §45, part of the Federal Trade Commission Act), the Telephone Consumer Protection Act, 47 U.S.C. §227, and related state laws. The appeal concerns the extent to which DISH had to coordinate do-not-call lists with and among these retailers or was otherwise responsible for their acts. The Telemarketing Sales Rule prohibits (i) calls to people who placed their names on the National Do Not Call Registry, (ii) calls to people who placed their names on a vendor's internal do-not-call list, and (iii) "abandoned" calls (so named because a system that fails to put the consumer in contact with a live person within two

seconds of the call connecting is deemed "abandoned"). See 16 C.F.R. §310.4(b)(1)(iii)(B), (A), and (b)(1)(iv). Those prohibitions give rise to most of the issues.

The district judge found that DISH caused violations of the Rule by engaging other entities to sell its service. As a fallback, the judge concluded that the order-entry retailers were DISH's agents, which made DISH responsible whenever any of these retailers called a person on any other retailer's do-not-call list (or on DISH's own). The district judge added that DISH was liable for having provided substantial assistance to one order-entry retailer, Star Satellite, in making abandoned calls. The judge found that DISH itself placed calls that violated the Rule. In addition, the district court deemed DISH liable for the order-entry retailers' violations of the state statutes. The Telephone Consumer Protection Act, §227(b)(1)(B), (c), and some state laws, which the district court's opinion collects, prohibit many prerecorded calls and calls to persons on the FTC's do-not-call registry.

We start with DISH's challenge to the district court's conclusion that it caused violations of statutes and regulations just by hiring others to sell its services. One provision in the Rule makes it unlawful for a seller to "cause a telemarketer to engage in" violations. 16 C.F.R. §310.4(b). Neither the regulation nor any judicial decision addresses what "cause" means. Plaintiffs maintain, and the district court found, that "cause" occurs whenever an act plays *any* role in the chain of acts leading to a violation. On this understanding the very existence of DISH "causes" all violations by anyone who, in the absence of satellite TV, would be in some other line of work. DISH maintains, to the contrary, that "cause" means "proximate cause," a phrase that excludes some effects that

are remote from the violation. See *Hemi Group, LLC v. New York City*, 559 U.S. 1 (2010) (applying a proximate-cause approach to civil RICO).

We are skeptical about both approaches. To engage a contractor is to cause *calls*, but not necessarily *violations*, and it is violations that the Rule prohibits a seller from causing. It may be that some retailers will make forbidden calls, but others will exceed the speed limit when driving, violate the minimum wage laws, or steal customers' funds. Would it make sense to say that DISH caused those offenses just by trying to sell TV service? The central question should be "cause *what*?" rather than "cause" in the abstract. This is a distinction that has been tackled for other bodies of law. For example, recovering damages for a violation of the securities law depends on establishing that the fraud caused a loss, not just caused the transaction in which a loss occurred. See, e.g., *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008); *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). The plaintiffs do not argue, and the district judge did not find, that DISH "caused" all violations in this sense, as opposed to causing efforts to sell its services.

We need not come to a conclusion about the meaning of "cause", however, because the district court also found that the order-entry retailers were DISH's agents, making DISH liable for their acts as a matter of state agency law. Liability in favor of the state plaintiffs depends on the agency finding: the state statutes and rules do not have a clause parallel to 16 C.F.R. §310.4(b), so we cannot avoid deciding whether the order-entry retailers were DISH's agents. If we agree with the district judge that they were, that resolves most issues of liability under both state and federal law. The debate about

"cause" would be dispositive only if we were to reject the district judge's agency ruling.

And DISH's decision not to contest any of the district judge's findings of fact greatly simplifies this analysis, because the existence of an agency relation is a question of fact. As with many factual issues the outcome depends on the application of legal rules to facts—in legal jargon agency is a "mixed question of law and fact"—but that does not open the subject to the sort of plenary review available to questions of law. See, e.g., *Pullman-Standard v. Swint*, 456 U.S. 273 (1982) (the existence of "discrimination" is a question of fact even though the decision depends on legal rules).

We have held that existence of an agency relation is a question of fact reviewed for clear error. See *Spitz v. Proven Winners North America, LLC*, 759 F.3d 724, 732 (7th Cir. 2014); *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 864 (7th Cir. 1998). These decisions accord with the Supreme Court's view, most recently expressed in *U.S. Bank, N.A. v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 967–68 (2018), that deferential rather than "legal" appellate review is appropriate when case-specific factual considerations dominate. See also *Monasky v. Taglieri*, 140 S. Ct. 719, 730 (2020).

DISH maintains that the district court legally erred when it interpreted the contract between the order-entry retailers and DISH. Interpretation presents a legal question in the absence of extrinsic evidence, of which there is none, but this does not assist DISH because the district judge got it right. The contract asserts that it does not create an agency relation, but parties cannot by ukase negate agency if the relation the contract creates is *substantively* one of agency. *Restatement (Third) of Agency* §1.02 (2006).

This contract (materially identical for all order-entry retailers) gave DISH the right to control their performance. Section 7.3 requires that "Retailer shall comply with all Business Rules". Section 1.6 provides a definition: "'Business Rule[]' means any term, requirement, condition, condition precedent, process or procedure associated with a Promotional Program or otherwise identified as a Business Rule by [DISH] … [DISH] has the right to modify any Business Rule at any time and from time to time in its sole and absolute discretion for any reason or no reason, upon notice to Retailer." These provisions gave DISH complete control over the order-entry retailers' performance. What's more, these retailers acted directly for DISH, entering orders into DISH's system; they did not have their own inventory and were not resellers of any kind. Under normal principles, they were DISH's agents notwithstanding the contractual disclaimer.

Next in line: is DISH liable as a principal for failing to ensure that it and all of its agents shared a single internal do-not-call list? The relevant portion of the Telemarketing Sales Rule, 16 C.F.R. §310.4(b)(1)(iii)(A), forbids calling a person who "previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered". Because the order-entry retailers were DISH's agents, DISH and the order-entry retailers were collectively one "seller whose goods or services are being offered". This meant that they had to act collectively; otherwise any household could receive endless calls peddling DISH's service, as long as each came from a different order-entry retailer. (The calls from the order-entry retailers were made within the scope of their agency; we need not consider whether coordination is re-

quired when someone who is not acting as a traditional agent places a call.)

The same analysis applies to the Ohio statute. It makes liable any party who either directly or as a result of a third party acting on its behalf engaged in unfair, deceptive, and unconscionable consumer sales practices. Ohio Rev. Code §§ 1345.02(A), 1345.03(A). Calling people on internal do-not-call lists violates this rule, and as with the Telemarketing Sales Rule, the order-entry retailers were the sort of agents required to coordinate lists with DISH. The order-entry retailers were acting on behalf of DISH for this purpose.

DISH contends that, if it is liable for failure to coordinate the do-not-call lists, this is a continuing violation whose penalty is capped by 15 U.S.C. §45(m)(1)(C): "In the case of a violation through continuing failure to comply with a rule or with [subsection (a)(1)], each day of continuance of such failure shall be treated as a separate violation". The district court disagreed with this contention and treated each call, rather than each day, as a violation. The Supreme Court has not yet examined this provision, nor has any court of appeals in a published opinion. The Court has held that a similar provision, §45(*l*), allows the government to seek a daily penalty for a continuing violation of a consent order to not acquire other bakeries (the defendant acquired a bakery and retained it). *United States v. ITT Continental Baking Co.*, 420 U.S. 223 (1975). That conclusion offers limited aid for our situation, as it's not clear whether a failure to coordinate lists is at all like a failure to divest a bakery.

Let us return to the text of the Rule. It prohibits sellers from "causing" a telemarketer to initiate "any outbound telephone call to a person" who "previously has stated that he

or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered". 16 C.F.R. §310.4(b)(1)(iii)(A). This tells us that the violation is the call, not the failure to coordinate internal do-not-call lists. Lack of coordination may lead to forbidden calls, but the absence of coordination is not itself a legal wrong. As long as sellers do not call people who have asked not to be called, they have satisfied their legal obligation. This implies that "such failure" in §45(m)(1)(C) refers to each call. A call that lasted multiple days would count as one violation per day; otherwise there is one violation per call. Cf. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (distinguishing between discrete violations of Title VII of the Civil Rights Act and continuous "hostile work environment" violations). No one has sought enhanced penalties for multi-day calls, and because the call is the violation §45(m)(1)(C) does not cut down liability to one penalty per day.

Some of the order-entry retailers' calls were wrongful independent of the list-coordination issue. These include calls to people on the National Do Not Call Registry, calls to people on the order-entry retailers' own internal lists, and abandoned calls, as well as some calls that violated state though not federal rules. The norm of agency is that a principal is liable for the wrongful acts of the agent taken within the scope of the agency—that is, the authority to complete the task assigned by the principal. See *Restatement (Third) of Agency* §7.08. A principal that learns of illegal behavior committed by its agents, chooses to do nothing, and continues to receive the gains, is liable for the agent's acts. See *NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A & A Drug Co.*, 736 F.3d 1054, 1059 (7th Cir. 2013).

The order-entry retailers were authorized to sell DISH's service by phone nationwide. In exercising that authority the order-entry retailers violated the prohibitions mentioned in the preceding paragraph, and the district court found that DISH knew about these retailers' wrongful acts (a factual finding not challenged on appeal). This is enough to make DISH liable as the principal.

Its primary argument against liability is that the contracts told the order-entry retailers to follow all applicable laws. DISH points to *Bridgeview Health Care Center, Ltd. v. Clark*, 816 F.3d 935 (7th Cir. 2016), as support for its position that such an instruction averts liability. In *Bridgeview* a small business explicitly told a marketing firm to send unsolicited fax ads to about 100 entities around Terre Haute. The firm sent, in addition to the local faxes, more than 4,500 faxes to businesses around Indiana and surrounding states without the small business's knowledge or permission. We held that the small business was liable for the 100 authorized faxes but not for the unauthorized ones.

*Bridgeview* does not stand for the proposition that generic instructions to follow the law immunize a principal from liability resulting from its agent's illegal acts, taken within the scope of authority. Instead it shows that acts *outside* of an agent's authority do not generate liability for the principal. The faxes were not unauthorized because they were illegal (the authorized faxes were also illegal). They were unauthorized because the principal did not give the agent authority to send them and lacked any knowledge of the agent's unauthorized actions. We added that the extra faxes did not benefit the small business, which did not sell its products out-

side of Terre Haute. Principals are not liable for acts that gratify an agent's desires at the principals' expense.

DISH's agents, by contrast, acted within their authority to sell TV service using phone calls, and those acts benefitted DISH. The district court found that DISH knew what the order-entry retailers were doing. That is enough for DISH to be liable for the order-entry retailers' illegal calls under those federal and state laws that extend beyond the failure to coordinate internal do-not-call lists.

We have one remaining question of liability. The district court found DISH liable under §310.3(b) of the Telemarketing Sales Rule for "substantially assisting" Star Satellite in making abandoned calls. This effectively means that the district court held DISH liable twice per abandoned call: once for making the call (through an agent) and once for assisting that agent. Then the district court declined to count the calls twice in calculating the penalty, so it is not clear why DISH bothers to protest.

To the extent that the "substantial assistance" finding affected the district court's exercise of discretion in selecting the penalty, however, the finding may matter—and it was mistaken. Section 310.3(b) says: "It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates [other provisions of the Rule]." While DISH is a "person" as defined in §310.2 of the Rule, context shows that the sort of "person" to which this prohibition applies is one that assists a "seller" or "telemarketer." Yet DISH is the seller for this purpose; as the principal to the

order-entry retailers, it is treated as the seller for all of their calls.

Section 310.3 does not create liability for assisting oneself. Such liability is possible in theory: Employee A could assist Employee B of the same entity to make a wrongful call. Longstanding principles require treating the employer and its employees as one entity, however. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). When an entity is vicariously responsible for another's acts (as a corporation is vicariously for the acts of its employees, and DISH is vicariously responsible for the acts of the order-entry retailers), it makes little sense to treat the entity as assisting itself. It would take clearer language than §310.3(b) to support such a conclusion. The district court therefore should not have held DISH liable for "substantially assisting" its own agents.

We move to DISH's statutory defenses. Liability is possible under 15 U.S.C. §45(m)(1)(A) only if a violator of regulations promulgated under the Federal Trade Commission Act (such as the Telemarketing Sales Rule) has either "actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." DISH contends that it cannot be liable under this standard for three reasons. First, it did not know of each individual call placed by the order-entry retailers (a mistake of fact). Second, it did not know that it would be liable for the actions of the order-entry retailers (another mistake of fact, given our holding that agency is a factual matter). Third, it did not know that it lacked an "established business relationship" with customers who had stopped paying their bills before DISH disconnected their service (a mistake of law).

The mistake-of-fact defense is weak. The knowledge of the agent is imputed to the principal. As the district court found, the order-entry retailers knew that they were making millions of calls, and they were making those calls to gain customers for DISH. Therefore, DISH knew of the calls as well. *Restatement (Third) of Agency* §5.03; *National Production Workers Union Insurance Trust v. Cigna Corp.*, 665 F.3d 897, 903 (7th Cir. 2011). And DISH's failure to understand this rule of agency law—that is, its mistaken belief that a disclaimer in the contract could avoid liability—does not provide a defense under this statutory language.

Can a party avoid liability under the Federal Trade Commission Act for a mistake of law? Traditionally, ignorance of the law is no excuse. But §45(m)(1)(A) includes a variation on an ignorance-of-the-law defense; a business can be liable only if it either knew that the act was unlawful or if it should have known the act was unlawful ("knowledge fairly implied"). See *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich L.P.A.*, 559 U.S. 573, 583–84 (2010). See also *United States v. National Financial Services, Inc.*, 98 F.3d 131, 139 (4th Cir. 1996).

But the state of DISH's knowledge is yet another factual question, and DISH has not challenged any finding of fact. The district court found that DISH had at least implied knowledge that the order-entry retailers were its agents and therefore would be liable for their actions. The district court concluded that DISH knew that it had control over the order-entry retailers and knew, too, that they were making unlawful calls. That was enough for DISH to be aware that it could be liable. A large national corporation with the ability

to hire sophisticated counsel is deemed to know basic principles of agency law.

Still, DISH argues, it did not know the legal definition of an "established business relationship" under 16 C.F.R. §310.2(q)(1). A business can call a customer with whom it has an "established business relationship" without regard to the National Do Not Call Registry or its internal do-not-call lists. 16 C.F.R. §310.4. An "established business relationship" depends on "the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the eighteen (18) months immediately preceding the date of a telemarketing call". 16 C.F.R. §310.2(q)(1). DISH asserts that the regulation treats a business relation as "established" through the last date a product was delivered. DISH points to this comment, which accompanied the Rule:

> The amended [Telemarketing Sales] Rule allows for an 18-month time limit where there has been a purchase, rental or lease, or other financial transaction between the customer and seller. The 18-month time limit for an "established business relationship" based on a purchase, lease, rental, or financial transaction runs from the date of the last payment or transaction, not from the first payment. In instances where consumers pay in advance for future services (e.g., purchase a two-year magazine subscription or health club membership), the seller may claim the exemption for 18 months from the last payment or shipment of the product.

68 Fed. Reg. 4361, 4593 (Jan. 29, 2003). DISH contends that this entitled it to start the 18-month period on the date it disconnected a customer's service, even if that date came after the customer's subscription expired for lack of payment. The district court, by contrast, used the customer's final payment as the start of the 18-month window.

We agree with the district court: the Rule shows that DISH needed to use the last date of payment. The text of the Rule starts the 18-month clock from the date a consumer purchases, rents, or leases the seller's goods or services. This makes 18 months from the last payment the terminal date. The contrary statement in the Federal Register (if it really is contrary) does not purport to interpret any of the Rule's text. An agency's reasonable interpretation of ambiguous regulations may be entitled to deference. *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). But this Rule is not ambiguous. To the extent that the Federal Trade Commission's comments are inconsistent with the Rule's text, the text prevails.

Finally, we move to damages.

DISH argues that the federal and state telemarketing laws violate the Due Process Clause of the Fifth Amendment because they fail to provide notice of potentially whopping penalties. This argument supposes that government must provide some notice on top of the statutes and rules themselves, but why? There's nothing ambiguous about them. If there is a problem, it isn't lack of notice.

DISH's other constitutional contention is that the maximum penalties allowed by the Telemarketing Sales Rule, the Telephone Consumer Protection Act, and the related state laws, substantively violate the Due Process Clause because they are too high. The maximum penalty is $10,000 per violation. Multiply this by the 66 million violations the district judge found and you get $660 billion. That's a huge number, but it is not possible to evaluate it separately from the penalty per violation, which is a normal number for an intentional wrong. Legislatures have "a wide latitude of discretion" to set civil penalties. *St. Louis, Iron Mountain & Southern Ry. v.*

*Williams*, 251 U.S. 63, 66 (1919). Someone whose maximum penalty reaches the mesosphere only because the number of violations reaches the stratosphere can't complain about the consequences of its own extensive misconduct.

A complaint about how the district judge exercised her discretion could in principle fare better. An award of $660 billion for the conduct in which DISH engaged would be impossible to justify—though a court of appeals could say that without reaching any constitutional argument. (Prudential arguments, such as a contention that a judge abused her discretion, come ahead of constitutional points. See, e.g., *New York City Transit Authority v. Beazer*, 440 U.S. 568, 582 (1979).) But the district court did not award $660 billion or anything close to it. The award is $280 million, closer to $4 than to $10,000 per improper call. This could be a constitutional problem only if a combination of compensatory and punitive damages adding to $4 violated the Due Process Clause. Yet if an unwanted call causes even $1 of harm, the "punitive" multiplier (around 3) likely comes within the Constitution's limit. See *State Farm Mutual Auto Insurance Co. v. Campbell*, 538 U.S. 408, 425 (2003) (questioning whether a punitive damages multiplier beyond nine can satisfy the Due Process Clause).

Still, as we have mentioned, statutory questions and an evaluation of the judge's use of discretion must precede any constitutional decision. The Federal Trade Commission Act requires that "[i]n determining the amount of such a civil penalty, the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15 U.S.C. §45(m)(1)(C). The

Telephone Consumer Protection Act does not include a provision that a court should consider a violator's ability to pay. One of the state statutes (Cal. Bus. & Prof. Code §17206) instructs courts to consider the violator's ability to pay, but the others do not. Yet the district court based the penalty entirely on DISH's ability to pay, setting it at 20% of a year's profits. That's a problem, especially under statutes that do not include ability to pay as even a permissible factor.

Normally the legal system bases civil damages and penalties on harm done, not on the depth of the wrongdoer's pocket. Legislatures can change this norm, and two of the statutes underlying this penalty permit consideration of wealth—though none permits it to be the sole factor. It is hard for us to see a justification, even under these two statutes, for starting from the defendant's wealth rather than harm. We appreciate that the district judge tried to ensure that the penalty was within a constitutionally allowable range, but the best way to do this is to start from harm rather than wealth, then add an appropriate multiplier, after the fashion of the antitrust laws (treble damages) or admiralty (double damages), to reflect the fact that many violations are not caught and penalized. See, e.g., *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) (admiralty); *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) (antitrust); *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 956 (7th Cir. 2018); *Zazú Designs v. L'Oréal, S.A.*, 979 F.2d 499, 505–06 (7th Cir. 1992).

The judgment of the district court is affirmed, except for its holding that DISH is liable for "substantially assisting" Star Satellite and its measure of damages. With respect to those matters, the judgment is vacated, and the case is remanded for further proceedings consistent with this opinion.