In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 25-1518 & 25-1672

ROBERT HOSSFELD,

*Plaintiff-Appellee/Cross-Appellant*,

*v.*

ALLSTATE INSURANCE COMPANY,

*Defendant-Appellant/Cross-Appellee*.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-07091 — **Joan B. Gottschall**, *Judge*.

ARGUED MAY 11, 2026 — DECIDED JUNE 24, 2026

Before ROVNER, SYKES, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. Atlantic Telemarketing Center placed twelve calls to Robert Hossfeld advertising automobile insurance policies from Allstate Insurance Company. Months prior, Hossfeld had asked Allstate not to place any marketing calls to his phone number. Claiming Allstate bore responsibility for Atlantic's phone calls under agency principles, Hossfeld sued Allstate for violating the Telephone Consumer Protection Act ("TCPA"), which requires companies to honor a

consumer's do-not-call request. He also filed for class certification, contending he represented a class of individuals similarly downtrodden by Allstate's telemarketing campaigns. The district court denied Hossfeld's motion for class certification but ruled in his favor on cross-motions for summary judgment regarding TCPA liability. We affirm the court's class certification ruling but reverse its summary judgment decision because Hossfeld failed to show Allstate is liable for Atlantic's calls under any theory of agency law.

## I. Background

### A. The Telephone Consumer Protection Act

In 1991, facing the rapid proliferation of robocalls and other telemarketing practices, Congress passed the TCPA. *See* 47 U.S.C. §§ 227–227b-2; 47 C.F.R. § 64.1200 (2020). Among other things, the TCPA and its implementing regulations prevent telemarketers from placing calls to individuals who have requested not to receive them. To that end, 47 C.F.R. § 64.1200(d) provides that "[n]o person or entity shall initiate … any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity." This list of individuals who request no calls from a particular company is commonly known as an internal do-not-call list. Section 64.1200(d) also provides the "minimum standards" for internal do-not-call list procedures. Telemarketers must, for example, maintain a written do-not-call policy, document all no-call requests, and honor those requests within a reasonable amount of time. § 64.1200(d)(1)–(6).

To assist enforcement, the TCPA provides a private right of action for consumers to sue companies for violations of the Act. 47 U.S.C. § 227(c)(5). Section 227(c)(5) allows any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations" to bring an action against that entity for injunctive relief, monetary damages, or both. And if the defendant's violation was willful or knowing, the plaintiff may receive treble damages. *Id.*

### B. Factual Background

Allstate sells insurance policies to customers nationwide. It solicits customers in part through telemarketing calls. The calls at issue in this suit arose from a marketing campaign initiated by two insurance agents—Jason Fleming and Daniel Gilmond—who sell Allstate insurance products. Under their contract with Allstate, Fleming and Gilmond agreed to comply with all applicable laws, including the TCPA, and to ensure any "external provider[s]" comply with all applicable laws and policies, too. This includes honoring Allstate's do-not-call policy, which forbids calls to anyone who has requested not to be called unless the caller believes that it has "express written invitation or consent."

Allstate insurance agents sometimes engage entities with which Allstate has no direct contractual relationship, called "Non-Contracted Telemarketers." During the relevant time period, Allstate permitted its direct agents "to engage Non-Contracted Telemarketers to initiate calls to consumers for the purpose of encouraging the purchase of Allstate products and services," but only if "the agent and Non-Contracted Telemarketers comply with [the] Agency Standards and incorporated Do Not Call Policy."

Fleming and Gilmond each retained one such Non-Contracted Telemarketer, a company called Transfer Kings, in 2020. Transfer Kings agreed to place calls to customers and transfer anyone interested in purchasing Allstate auto insurance to the insurance agents.

But rather than place the calls for the insurance agents itself, Transfer Kings subcontracted the work to yet another telemarketing company, Atlantic. Transfer Kings did not tell Fleming and Gilmond about Atlantic when the agents hired Transfer Kings. Neither Allstate nor its insurance agents knew that Atlantic existed and was marketing Allstate insurance until after Hossfeld filed his lawsuit.

Atlantic placed twelve calls to Hossfeld marketing Allstate products and services from November 2020 to February 2021. Allstate's internal do-not-call list had included Hossfeld's phone number since July 10, 2020—about five months before Atlantic placed the calls at issue. Allstate did not place any of these calls itself, nor did Allstate direct Atlantic to place the calls.

Before placing the calls, Atlantic had purchased a list of prospective customers, known as "leads," from another company called KP Leads. KP Leads represented that all the phone numbers on the leads list belonged to people who had consented to receiving phone calls.

The list KP Leads purchased included Hossfeld's phone number, but it was associated with the names "Michael Johnson" and "Michael Bradley." Hossfeld also misrepresented his identity on the calls at issue in this case, using various aliases. In the past, Hossfeld had feigned interest in an auto insurance quote online under the fake names. He explained he

did this "to investigate" the telemarketing calls to make them stop.

Atlantic eventually connected Hossfeld to Fleming and Gilmond, who later emailed him quotes. Hossfeld never purchased any insurance from Allstate.

**C. Procedural Background**

Hossfeld sued Allstate under the TCPA's private remedy provision, alleging Allstate failed to maintain a sufficient internal do-not-call policy and impermissibly called him despite his no-call requests. *See* 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(d). He sought damages and an injunction to prevent further violative marketing calls. *See* § 227(c)(5)(C). Hossfeld also moved for class certification, claiming that Allstate's violations implicated a large number of similarly wronged call recipients. The district court denied Hossfeld's motion, however, explaining he had failed to prove that his proposed class was sufficiently numerous to justify a class action. *See* Fed. R. Civ. P. 23(a)(1) (requiring a plaintiff to show that the "class is so numerous that joinder of all members is impracticable").

Ruling on cross-motions for summary judgment, the district judge sided with Hossfeld, concluding that Allstate was vicariously liable for Atlantic's TCPA violations. Because (according to the court) Allstate authorized its insurance agents to appoint Transfer Kings on its behalf, and Transfer Kings in turn hired Atlantic, Atlantic's actions flowed up the chain of agency and implicated Allstate. The court further found Allstate's violations were willful and knowing under § 227(c)(5), triggering treble damages.

Allstate now appeals the district court's summary judgment finding it liable and Hossfeld cross-appeals the class certification denial.

## II. Legal Standard

We review the district court's grant of summary judgment *de novo*, drawing all reasonable inferences in the nonmovant's favor. *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022). "Summary judgment is appropriate when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law." *Id.* A factual dispute is "genuine" if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Christensen v. Weiss*, 145 F.4th 743, 751 (7th Cir. 2025).

## III. Discussion

Allstate challenges the district court's summary judgment decision finding Allstate vicariously liable for Atlantic's willful violations of the TCPA. The parties also dispute whether Allstate was vicariously liable for Atlantic's actions under alternative agency-law theories. For his part, Hossfeld challenges the court's denial of class certification, arguing it erred in its numerosity analysis. We address each issue in turn.

### A. Liability for Atlantic's Calls to Hossfeld

Hossfeld argues that Allstate is liable for Atlantic's calls under doctrines of agency law that render an agent's conduct legally attributable to a principal. "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf." Restatement (Third) of Agency § 1.01 (2006); *see Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000) ("[T]he federal common law of agency[]

accord[s] with the Restatement."). Under an agency relationship, the agent "acts on behalf of [the principal] with power to affect the [principal's] legal rights and duties." Restatement § 1.01 cmt. c. Though often agency is confined to the agent and principal only, some agency relationships involve a subagent—someone the agent appoints "to perform functions that the agent has consented to perform on behalf of the agent's principal." *Id.* § 1.04(8). A subagent's acts, like an agent's, can legally implicate the principal. *Id.* § 3.15 cmt. c.

Agency law recognizes various theories for attributing liability from agent to principal. The two relevant here are actual authority and apparent authority. An agent acts with actual authority if, "at the time of an agent's conduct, 'the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.'" *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021) (quoting Restatement § 2.01). An agent acts with apparent authority when "a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement § 2.03. Absent either type of authority, an agent's act is still attributable to a principal if the principal ratifies the act. *Id.* § 4.01. "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Id.* § 4.01(1). A principal may ratify an act by manifesting assent to the act. *Id.* § 4.01(2). If an agent acts with actual or apparent authority or the principal ratifies the agent's act, the principal is liable for the legal consequences of that act.

These common law agency principles apply to the TCPA and may operate to hold a defendant vicariously liable for the

TCPA violations of another. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016) (citing *In re Joint Petition Filed by Dish Network, LLC,* 28 FCC Rcd. 6574 (2013)); *Warciak v. Subway Rests., Inc.*, 949 F.3d 354, 356 (7th Cir. 2020) (applying federal common law of agency to assess vicarious liability for TCPA violations); *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 938 (7th Cir. 2016) (same). Hossfeld claims Allstate is vicariously liable for Atlantic's calls because Atlantic was Allstate's subagent acting with actual authority or, alternatively, because Allstate effectively authorized Atlantic's calls under apparent authority and ratification theories.[1] Hossfeld failed to raise a genuine issue of fact that would allow a jury to find Allstate liable under any of these theories.

### 1. Subagency Theory

Following the district court's lead, Hossfeld argues Allstate bears responsibility for Atlantic's actions because Atlantic was the insurance company's "subagent." Subagency theory acknowledges that a principal may sometimes authorize its agent to appoint an additional party to perform some of the tasks the principal delegated to the agent. Restatement § 3.15(1). With the principal's blessing, the added party joins the agency relationship as a subagent. *Id.* The subagent shares

---

[1] Hossfeld appears to argue for the first time on appeal that Allstate was also directly liable for Atlantic's calls by virtue of its inadequate do-not-call policy. He conceded during oral argument, however, that he failed to raise a direct liability argument below and did not press it further. *See* Oral Argument at 15:38–16:00, *Hossfeld v. Allstate Ins. Co.*, No. 25-1518 (2026), media.ca7.uscourts.gov/sound/2026/dab.25-1518.25-1518_05_11_2026.mp3. Hossfeld has therefore waived any direct liability arguments regarding Allstate's policies on appeal. *See Crothersville Lighthouse Tabernacle Church, Inc. v. Church Mut. Ins. Co.*, 168 F.4th 483, 491 (7th Cir. 2026).

an agency relationship with both the agent who appointed it and the original principal. "Thus, a subagent has two principals, the appointing agent and that agent's principal." *Id.* cmt. b. As such, legal responsibility for the subagent's actions travels up the chain of agency, implicating both the appointing agent and the principal. *Id.*

"An agent may appoint a subagent only if the agent has actual or apparent authority to do so." *Id.* § 3.15(2). This is consistent with agency principles more generally: Only actions within the scope of an agent's authority may legally implicate the principal. *United States v. Dish Network L.L.C.*, 954 F.3d 970, 977 (7th Cir. 2020) ("[A]cts *outside* of an agent's authority do not generate liability for the principal."). If an agent signs a contract it had no authority to sign, for example, the contract does not legally bind the principal. *See Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 65 n.21 (1984). An agent's tortious behavior beyond its authority implicates only the agent, not the principal. *See Dish Network*, 954 F.3d at 977. And if an agent has no authority to appoint a subagent to perform the tasks delegated to it, any person the agent appoints is the agent's responsibility, not the principal's. Restatement § 3.15 cmt. c; 3 Am. Jur. 2d Agency § 127 ("The principal will not be held responsible for the tortious conduct of a subagent appointed without authority because a person is the agent of the agent, not of the principal.").

A subagent may, in turn, appoint a sub-subagent, for whose conduct the subagent is responsible, and who also has an agency relationship with the principal. Restatement § 3.15 cmt. c. The subagent, like the agent, must have actual or apparent authority to appoint the sub-subagent. *Id.* Thus, multiple subagency relationships may stack upon each other in a

series. But for this to occur, there must be appointing authority at each level to support an agency relationship between each subagent and the principal. *Id.*

The district court held, and Hossfeld argues on appeal, that Atlantic was a validly appointed subagent whose liability accordingly implicates Allstate. Because Transfer Kings hired Atlantic, the central question is whether Transfer Kings had authority to appoint Atlantic to act on Allstate's behalf. If not, Atlantic was an agent of Transfer Kings, and any liability Atlantic incurred for its calls flowed to Transfer Kings, never reaching Allstate. The district court and Hossfeld both focus on actual authority as the attributive mechanism, so we do the same, finding Hossfeld failed to raise an issue of fact that Transfer Kings had actual authority to appoint Atlantic.

An agent has actual authority to appoint a subagent "when the agent reasonably believes, based on a manifestation from the principal, that the principal consents to the appointment of a subagent." *Id.* A principal's consent to a subagent's appointment may be express or implied, *id.*, and may be communicated "through written or spoken words or other conduct," *id.* at § 1.03.

For an agent to have express actual authority, the principal "must have directly spoken or written to" or otherwise acted toward the agent instructing him to take the specified action. *Bridgeview*, 816 F.3d at 939. Here, nothing Allstate said or did indicated it authorized Transfer Kings to appoint sub-subagents on its behalf. In fact, the record is devoid of any communications from Allstate to Transfer Kings at the time Transfer Kings hired Atlantic, and Hossfeld concedes Allstate did not know Transfer Kings existed before he filed this suit. Though Allstate later communicated with Transfer Kings to

investigate Hossfeld's complaints, actual authority analysis focuses on what the purported agent knew when it acted. *See* Restatement § 3.15 cmt. c. Transfer Kings must have reasonably believed *at the time it hired Atlantic* that Allstate authorized it to do so. Those later communications therefore did not retroactively authorize Transfer Kings to appoint Atlantic months earlier.

Hossfeld and the district court rely, instead, on language from Allstate's contracts with Fleming and Gilmond, which instructs the insurance agents to ensure all "external suppliers" and "provider[s]" comply with the relevant laws and policies when "placing any calls for Allstate." This language, they claim, shows Allstate contemplated the appointment of subagents to place calls on its behalf. Thus, Fleming and Gilmond had authority to appoint Transfer Kings, who in turn had authority to appoint Atlantic. But this reasoning improperly collapses the subagency analysis, which requires authority to support *each* layer of delegation. Perhaps Fleming and Gilmond could reasonably believe Allstate allowed them to appoint subagents based on Allstate's reference to external suppliers. But the central question is whether Allstate authorized Transfer Kings to appoint subagents, not whether it authorized Fleming and Gilmond to do so. Transfer Kings had no contract with Allstate referencing external suppliers, nor is there evidence that Transfer Kings saw the quoted contract language before hiring Atlantic. Allstate did not direct the contract language at Transfer Kings, and it could not have been a basis for Transfer Kings to reasonably believe Allstate authorized it to appoint subagents on its behalf.

Hossfeld's contention that the contract language does not necessarily limit appointment of subagents to a single level of

delegation misses the point. Actual authority hinges on a principal's manifestation *to the agent* that leads the agent to reasonably believe he has authority. *See Bilek*, 8 F.4th at 587; Restatement § 2.01. Even if the contract language does not explicitly limit appointing authority to Allstate's direct insurance agents, any express actual authority is nevertheless limited to those agents because Allstate directed its manifestation to the agents, not to Transfer Kings. Hossfeld also fails to identify a limiting principle for his argument. If Allstate's liability extends to Atlantic because the contract language references external entities, what would stop it from extending beyond Atlantic through unlimited layers of subagents? Adopting Hossfeld's position would allow for seemingly infinite levels of subagency—and an accompanying unending chain of vicarious liability—all without any hint of Allstate's assent.

Moreover, Hossfeld's argument—that the contract does not *forbid* subagents from appointing sub-subagents—misunderstands his burden to produce affirmative evidence showing Transfer Kings was authorized to appoint Atlantic. *See Valenti v. Qualex, Inc.*, 970 F.2d 363, 367 (7th Cir. 1992) ("The party alleging an agency relationship has the burden of proving it."). Agency relationships are not the default, so it is insufficient to show merely that there is no evidence indicating the *absence* of authority; Hossfeld must show its presence.

The district court similarly misunderstood Hossfeld's burden when it reasoned that Transfer Kings could appoint subagents because nothing in the record strictly *forbade* it from doing so or indicated that the appointment was *not* standard industry practice. This lack of evidence does not satisfy Hossfeld's burden to produce evidence affirmatively showing Transfer Kings was authorized to appoint Atlantic as a

subagent. *See Bank of Com. v. Hoffman*, 829 F.3d 542, 545–56 (7th Cir. 2016). Hossfeld failed to make that showing, so Allstate had no burden to overcome a presumption of actual authority. *Id.*

Hossfeld identifies no evidence that would allow a jury to find Allstate directly spoke, wrote, or acted toward Transfer Kings authorizing it to appoint anyone to make telemarketing calls on Allstate's behalf. Accordingly, Transfer Kings did not have express actual authority to do so. *See Bridgeview*, 816 F.3d at 939.

Nor did Hossfeld present any evidence of implied actual authority, which applies when an agent is authorized to take actions "necessary, usual, and proper to accomplish" the agent's express responsibilities. Restatement § 2.01 cmt. b. Industry customs often show what duties are impliedly part of an agent's authority, but Hossfeld submitted no evidence on that point. *See Bridgeview*, 816 F.3d at 939 ("Implied authority is inherently contained in the agent's position."). We see no reason to find that insurance marketing "inherently demands" endless chains of subagents. *Id.* Thus, contrary to the district court's holding, the undisputed facts show Transfer Kings had neither express nor implied actual authority to appoint Atlantic as a subagent. Hossfeld therefore cannot succeed in holding Allstate vicariously liable on a subagency theory.

### 2. Alternative Theories

Hossfeld argues alternatively, as he did below, that Allstate is liable for Atlantic's calls either because Atlantic had

apparent authority to make the calls or because Allstate rati-fied them.[2] As we explain, neither argument succeeds.

First, though, a preliminary matter: We reject Hossfeld's assertion that Allstate waived any arguments as to apparent authority and ratification by failing to address either theory in its opening brief. Because the district court's decision reached neither issue, this is not a case where the appellant waives an argument by failing to "engage[] with the reason-ing of the district court." *Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023). When Hossfeld raised these alternative affirmance arguments in his response, Allstate properly addressed them in its reply brief. *See Bennett v. Tucker*, 827 F.2d 63, 69 n.2 (7th Cir. 1987); *see also United States v. Brown*, 348 F.3d 1200, 1213 (10th Cir. 2003) ("When an ap-pellee raises in its answer brief an alternative ground for affir-mance, the appellant is entitled to respond in its reply brief.").

Turning now to Hossfeld's apparent authority argument. "Apparent authority … is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." Restatement § 3.03. Because apparent authority relies on a manifestation of the principal, "[t]o create apparent authority, the principal must speak, write, or otherwise act toward a third party." *Bridgeview*, 816

---

[2] The district court did not address apparent authority or ratification, but we resolve both arguments rather than remanding to the district court because "[t]he parties have had a full and fair opportunity to argue all relevant aspects of" these issues and the "correct resolution … is clear." *Otto v. Variable Annuity Life Ins. Co.*, 814 F.2d 1127, 1137–38 (7th Cir. 1987).

F.3d at 939. Further, "only the words or conduct of the alleged principal, not the alleged agent, establish the [apparent] authority of an agent." *Opp*, 231 F.3d at 1064 (citation modified); *accord Warciak*, 949 F.3d at 357 ("Statements by an agent are insufficient to create apparent authority."); Restatement § 2.03 cmt. c. ("An agent's success in misleading the third party as to the existence of [] authority does not in itself make the principal accountable.").

Hossfeld offers no evidence Allstate interacted with him in any way, let alone in a way that led him to reasonably believe Allstate authorized Atlantic to act as its agent. Hossfeld nonetheless insists Atlantic had apparent authority because its representatives stated they were calling on Allstate's behalf. But Allstate never made those statements, nor did it instruct Atlantic to do so. Hossfeld identified no evidence to trace Atlantic's call introductions, or Hossfeld's alleged reliance on them, to any manifestation by Allstate—the only party that matters for apparent authority analysis.

Nor does Hossfeld raise an issue of fact, as he must, that he reasonably relied on Atlantic's apparent authority. *See Warciak*, 949 F.3d at 357 (affirming dismissal where complaint failed to show plaintiff "reasonably relied, to his detriment, on any apparent authority" that may have existed). Hossfeld does not show that he took any actions after receiving Atlantic's calls and emails, and he concedes he never purchased any of Allstate's services. This is unsurprising, as Hossfeld admitted he was only pretending to be interested in Allstate's insurance policies and never intended to purchase one. Hossfeld fails to show he reasonably relied on any representation that Atlantic acted on Allstate's behalf, so his apparent authority argument fails for this reason, too. *Id.*

Turning next to Hossfeld's ratification theory, he again has failed to raise any genuine dispute of material fact that would allow a jury to find for him. Hossfeld argues Allstate ratified Atlantic's calls to him by accepting benefits arising from the non-compliant calls. *See* Restatement § 4.01, cmt. d. ("[K]nowing acceptance of the benefit of a transaction ratifies the act of entering into the transaction."). He claims Allstate's benefits sound in thousands of customer insurance quotes and hundreds of issued policies arising from telemarketing calls made on Allstate's behalf.

But this is too broad. The TCPA's private remedy provision permits a plaintiff to challenge only calls placed to him, rather than a company's calling practices writ large (absent a class action), so Hossfeld must show Allstate retained benefits based on Atlantic's calls to him specifically. It is not enough that Allstate continued to operate and accept benefits from its telemarketing programs more generally.

We see no evidence that Allstate knowingly retained any benefits arising from the calls Atlantic placed to Hossfeld. Hossfeld admits he never obtained insurance or any other services from Allstate. And even if the act of sending a quote or email to a potential customer constituted a "benefit," it was Allstate's agents, not Allstate, who sent the quotes to Hossfeld. This is insufficient to support that Allstate knowingly accepted and retained any benefit stemming from the calls to Hossfeld.

Hossfeld also argues Allstate ratified Atlantic's calls through a "failure to act." *Id.* § 4.01 cmt. f. ("A principal may ratify an act by failing to object to it or to repudiate it…. Failure to object may constitute such a manifestation [of assent] when the [principal] has notice that others are likely to draw

such an inference from silence."). To ratify through inaction, the principal must have "knowledge of material facts about the agent's act unless the principal chose to ratify with awareness that such knowledge was lacking." *Id.* § 4.01, cmt. b.

It is doubtful the evidence here could allow a reasonable jury to find Allstate knew Atlantic was placing calls marketing its insurance. Hossfeld cites to a late-2020 email thread between Transfer Kings and Allstate, but the thread does not discuss Atlantic's role and Atlantic is not a party to it. The email chain references Atlantic's name only in the title of an attached Excel document, and the title is never explained. He also points to a 2021 video call between a Transfer Kings representative and Allstate's compliance officers, but the Transfer Kings representative admits that during the call, he obfuscated Atlantic's role and did not disclose that Atlantic was placing calls for Allstate.

But even assuming Allstate knew Atlantic was calling Hossfeld's number and marketing Allstate insurance products to him, Hossfeld has not shown Allstate ratified Atlantic's calls through inaction. To the contrary, Allstate promptly traced the problematic calls to Transfer Kings and immediately began a thorough investigation into the calls and the source of the leads. And within a few months of the investigation and meeting with Transfer Kings' representative, Allstate prohibited its insurance agents from contracting with either Transfer Kings or Atlantic. No reasonable jury could construe Allstate's response as a total failure to act tantamount to ratification of Atlantic's calls. *See Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243, 252 (4th Cir. 2018) (finding no ratification in TCPA case where defendant quickly responded

to complaints about unwanted calls and ultimately terminated any involvement with that telemarketer).

### B. Willfulness Standard

The TCPA provides for treble damages if the plaintiff shows "that the defendant willfully or knowingly violated the regulations." 47 U.S.C. § 227(c)(5). The district court found that "willful" in the context of the TCPA requires only that the violator's acts be "volitional." This is not the correct standard.

Though we have not defined "willful" in the TCPA context, we have said that "[t]o act 'willfully' is, for purposes of civil law, to engage in conduct that creates 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Redman v. RadioShack Corp.*, 768 F.3d 622, 627 (7th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836, (1994)). In other words, to act recklessly. *Id.* To find a civil defendant's actions reckless, the risk of a violation must be "serious and eminently avoidable," and either known to the defendant or so obvious that it should have been known to them. *Id.* (citing *Slade v. Bd. of Sch. Dirs.*, 702 F.3d 1027, 1029 (7th Cir. 2012)).

The Supreme Court has confirmed that willfulness, in the civil liability context, refers to both knowing and reckless violations of a standard. *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 56–60, (2007). The Court held "willful" included both actions taken with knowledge that they violate the relevant statute and actions done with reckless disregard for whether they are violative. *Id*.

We have adopted the *Safeco* standard in addressing whether a company willfully violated the Fair and Accurate Credit Transactions Act. *See, e.g.*, *Persinger v. Sw. Credit Sys.*,

*L.P.*, 20 F.4th 1184, 1197 (7th Cir. 2021) ("A willful violation is one committed with actual knowledge or recklessness." (citing *Safeco*, 551 U.S. at 56–57)); *Redman*, 768 F.3d at 638 (similar). We see no reason why a different standard should apply to willfulness under the TCPA than applies to federal statutory schemes governing credit reporting issues. Both schemes address broad issues that plague consumers, provide a private right of action, and allow for increased damages for willful violations.

Our conclusion aligns with the other courts of appeals who have considered the issue. The Fourth Circuit explained that willfulness under the TCPA requires more than negligence, imposing treble damages only if the defendant's actions "demonstrated indifference to ongoing violations and a conscious disregard for compliance with the law." *Krakauer v. Dish Network*, L.L.C., 925 F.3d 643, 661–62 (4th Cir. 2019). And the Eleventh Circuit has consistently required a TCPA violator to "know he was performing the conduct that violates the statute," rather than merely acting volitionally to impose treble damages. *See, e.g., Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015).

Volitional action is thus insufficient to trigger treble damages under the TCPA; we require reckless or knowing behavior.

**C. Class Certification**

We turn finally to the district court's denial of Hossfeld's class certification motion, which we review for an abuse of discretion. *See Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 598 (7th Cir. 2021).

A plaintiff seeking class certification must show, among other things, that the putative "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While "impracticable" does not mean "impossible," a class representative must show "that it is extremely difficult or inconvenient to join all the members of the class." *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) (quoting 7A Charles Wright & Arthur Miller, Federal Practice & Procedure § 1762 (3d ed. 2005)). As the party seeking class certification, Hossfeld bears the burden of proving by a preponderance of evidence that his proposed class is sufficiently numerous. *Id.* (citing *Chi. Tchrs. Union, Local No. 1 v. Bd. of Educ.*, 797 F.3d 426, 433 (7th Cir. 2015)).

"The key numerosity inquiry under Rule 23(a)(1) is not the number of class members alone but the practicability of joinder." *Id.* In assessing practicability, we evaluate "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute." *Id.* (quoting Wright & Miller at § 1762). We have recognized that "a forty-member class is often regarded as sufficient to meet the numerosity requirement." *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020) (quoting *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017)). "But a class of 40 or more does not guarantee numerosity." *Anderson*, 986 F.3d at 777.

Before the district court, Hossfeld identified thirty-three unique telephone numbers (including his own) on Allstate's internal do-not-call list that Transfer Kings or Atlantic had called as part of the same campaign to sell Allstate insurance. He assured the court there were certain to be more class members given the alleged lack of coordination of do-not-call lists

between Allstate and Transfer Kings. But he cited no evidence supporting this speculation and mounted no argument that joinder would be impracticable.

The district court did not abuse its discretion by dismissing Hossfeld's class certification motion for lack of numerosity. A plaintiff must produce more than "speculation as to the size of the class in order to prove numerosity." *Id.* at 778. Hossfeld failed to do so. The thirty-three-member class he presented fell easily below the general forty-member benchmark, and he failed to meet his burden by showing the impracticability of joinder. Hossfeld failed entirely to make any argument as to impracticability, and the court was not required to construct legal arguments on his behalf. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Hossfeld has not shown the district court abused its discretion.

Finally, Hossfeld asks us to modify the district court's class-certification ruling in light of a "changed landscape." Even if the court did not abuse its discretion, Hossfeld argues, the facts have changed so significantly that we can—and should—amend the ruling. He cites Rule 23, which states that a class certification ruling "may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). But Rule 23 only allows for modification *before* final judgment, which has already passed for Hossfeld. *See* Docket No. 327 (Order Entering Final Judgment (Mar. 20, 2025)). More fundamentally, Rule 23 only allows a district court judge to modify her own class certification ruling. Though a district court may modify its order before final judgment, it does not follow that *we* may modify it or instruct the district court to do so. Even if the landscape has changed, which we doubt, we lack the power to amend the district court's ruling.

Our only mechanism for disturbing the district court's class certification ruling is to reverse it if we find the court abused its discretion. *See Howard*, 989 F.3d at 610. As discussed, we find no such abuse here, so we uphold the district court's denial of the class certification motion.

\*        \*        \*

We affirm the district court's class certification ruling but reverse the court's summary judgment and direct the court to enter judgment for Allstate. The district court's judgment is

AFFIRMED IN PART AND REVERSED IN PART.